## In re ESTABLISHMENT INSPECTION OF HERN IRON WORKS, INC.

### DEPARTMENT OF LABOR OSHA, Plaintiff–Appellee,

v.

### HERN IRON WORKS, INC., Defendant–Appellant.

No. 88–3668

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 1989.

Decided Aug. 3, 1989.

Paul Farley, Mountain States Legal Foundation, Denver, Colo., for defendant-appellant Hern Iron Works, Inc.

John Shortall, Dept. of Labor, Washington, D.C., for plaintiff-appellee Occupational Safety and Health Admin. and the U.S. Dept. of Labor.

Before REINHARDT, KOZINSKI and TROTT, Circuit Judges.

REINHARDT, Circuit Judge:

On June 11, 1987, Chief Judge Marion J. Callister of the District Court of Idaho issued a warrant authorizing officers of the Occupational Safety and Health Administration (OSHA) to inspect an iron foundry in Coeur d'Alene owned and operated by Hern Iron Works (Hern Iron). On the morning of June 23, OSHA inspectors served the administrative warrant on the principal owner and chief executive officer of the company, John Hern, Jr. (Hern). Hern barred the inspectors from the corporate premises. He informed them that he would not consent to the search until his lawyers had sufficient time to examine the

warrant. In the afternoon, the inspectors returned. Hern again refused entry, contending that more time was needed for proper review.[1] This pattern was repeated twice the next day.

On July 25, Hern Iron filed a motion to quash the warrant. Shortly thereafter, OSHA officials, frustrated in their attempts to inspect the foundry, sought an order of contempt against the company. The United States Magistrate joined the two motions and issued an order to show cause. After holding an evidentiary hearing, the magistrate recommended imposition of contempt sanctions. The district court adopted the magistrate's findings and his proposed sanctions in their entirety. The court fined Hern Iron $2000 and ordered the company to reimburse the Secretary of Labor for her costs in litigating the case. Hern Iron appealed. We affirm.[2]

## I.

Although the facts elicited above are sufficient for the legal conclusions necessary to the case, the brief recitation of events fails to capture the full flavor of the controversy that sparked this appeal. The roots of this case reach back almost 15 years. They touch a string of attempts, both successful and unsuccessful, by OSHA to inspect the foundry, and they also encompass a set of conflicting philosophies about the role of government and the requirements of work place safety.

As the record of this case reveals, OSHA officials first attempted a warrantless inspection of Hern Iron in 1975. Hern refused inspection, and OSHA aborted its plan.[3] This pattern was repeated in 1978. The next year, pursuant to an employee complaint, OSHA inspectors appeared unannounced at the foundry; this time, the officers came armed with a warrant. Hern barred entry. OSHA sought enforcement of its warrant in federal court. At the contempt hearing, Hern Iron raised several legal defenses and claimed "strong moral objections to the OSHA Act." The district court nevertheless sanctioned Hern Iron; we upheld the order. However, because of the extensive judicial proceedings, OSHA did not complete its inspection until almost three full years had passed from the date that the magistrate issued the warrant. *See Hern Iron Works, Inc. v. Donovan*, 670 F.2d 838 (9th Cir.1982).

The next significant episode occurred in September of 1985. Loren B. Canada, Sr., Acting Area Director of OSHA, forwarded a letter of inquiry to Hern.[4] The letter detailed a variety of employee complaints, ranging from unsanitary restrooms to the presence of rats and snakes near the eating areas to a lack of proper protective equipment for employees. In a strongly worded response, Hern denied the charges. OSHA did not attempt to inspect the premises.[5]

In June, 1986, more employee complaints were entered against appellant. OSHA's new Area Director, Ryan Kuehmichel, again directed an inquiry letter to the company. Again, Hern fired off a combative response. This time he not only attacked

---

**1.** On appeal, Hern Iron argues that the inspectors were never refused entry to the premises. Instead, appellant characterizes Hern's actions as merely a request for additional time to consult with counsel. Under this version of the facts, OSHA inspectors were always free to enter the foundry. However, the district court found, as a factual matter, that Hern refused entry to the inspectors. On this record, we do not think that the court finding was clearly erroneous.

**2.** The magistrate also refused to quash the warrant. The district court again adopted the recommendations of the magistrate in their entirety. Hern Iron separately appealed the denial of the motion to quash, but that appeal was dismissed upon motion of the parties.

**3.** OSHA did successfully conduct a brief inspection, pursuant to a court order, on July 8–9, 1975.

**4.** The complete history of the conflict between OSHA and Hern cannot be fully distilled here. However, the record before us details other battles that have been carried out in the press and in correspondence with elected representatives.

**5.** OSHA's administrative search system is composed of two types of inspections. Programmed inspections are scheduled pursuant to a neutral plan, discussed *infra;* unprogrammed inspections are conducted only after OSHA has accumulated sufficient evidence, generally by way of employee complaint, of code violations.

the factual accuracy of the allegations but also challenged the very premise of the OSHA inspection system.

> The result of all this is that I have wasted a bunch of my time and you have wasted a bunch of the taxpayer's money and nobody is any safer. This is the whole problem with OSHA. All you are doing is serving as a tool whereby disgruntled ex-employees who didn't get their unemployment benefits can make anonymous phone calls and cause trouble for business. It makes you look like fools and wastes everyone's time and money. If you want to do something for safety, why don't you try to help the employers by providing information about unsafe products and processes rather than running around like the Gestapo with our secret informants and star courts.

Hern sent copies of the missive to his elected representatives in Washington. Again, OSHA did not inspect.

The incident giving rise to this litigation formed the next significant encounter between Hern Iron and OSHA. On June 11, OSHA petitioned the district court for an administrative search warrant to inspect the Hern foundry. In its application, OSHA stated that the inspection was scheduled pursuant to its General Schedule System (GSS). In a supporting affidavit, Kuehmichel stated that the GSS was the schedule used for all programmed OSHA activity conducted within the state of Idaho, that Hern Iron was selected pursuant to the GSS, and that the selection process was not tainted by any factors outside the scope of the administrative search plan.

The General Schedule System outlines the search policies of OSHA. Under the plan, each industry is assigned a nationwide Standard Industrial Classification (SIC) Code. OSHA then forwards a "high rate" SIC report to each state, listing each industry with a lost work day injury rate (LWDI) at or above the national LWDI rate for all industries. After OSHA completes a complex series of numbering procedures, the inspection sites are generated randomly from each high rate industry. OSHA appended a copy of the GSS to its warrant affidavit. Although this document included a lengthy, frequently turgid, description of the plan, it inexplicably did not contain the fact that the final inspection list for each industry was randomly generated from the high rate industries list or otherwise explain how companies were ultimately selected for inspection.[6]

On appeal, Hern Iron contends that the court erred in not quashing the warrant for several reasons. Appellant's principal argument is that OSHA failed to include necessary, neutral criteria such as the methodology of ranking the local foundries and the process for making selections among the listed companies. The omissions in the warrant application, Hern Iron asserts, render the warrant fatally defective and, therefore, vitiate the contempt order.

## II.

■ Hern Iron's challenge to the contempt order can be reduced to a simple syllogism: the contempt order is based upon the underlying warrant; the underlying warrant is invalid under the Fourth Amendment;[7] therefore, the contempt order cannot be enforced. While appellant's argument flows with a comfortable logic, the third step of the syllogism runs afoul of one of the most fundamental doctrines of judicial authority, the collateral bar rule.[8] In brief, the collateral bar rule permits a judicial order to be enforced through criminal contempt even though the underlying decision may be incorrect and even unconstitutional. *See United States v.*

---

**6.** The random nature of the selection process was in fact not revealed until Roger Law, Compliance and Safety Director at OSHA, testified to that effect at the contempt hearing before the Magistrate.

**7.** *See Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (outlining Fourth Amendment test for administrative search warrants).

**8.** *See, e.g., In re Providence Journal Co.,* 820 F.2d 1342, 1344 (1st Cir.1986) (calling collateral bar doctrine "sine qua non of orderly government").

*United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Howat v. Kansas*, 258 U.S. 181, 189, 42 S.Ct. 277, 280, 66 L.Ed. 550 (1922). The contemnor cannot ordinarily raise the invalidity of the judicial order as a defense to a contempt charge.

The genesis of the collateral bar rule stems from the widely held belief that a smoothly functioning judicial process may be jeopardized if parties are able to determine for themselves when and how to obey court orders. "The orderly and expeditious administration of justice by the courts requires that 'an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.'" *Maness v. Meyers*, 419 U.S. 449, 459, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975) (quoting *United Mine Workers*, 330 U.S. at 293, 67 S.Ct. at 696). According to this view, although both counsel and litigant may exercise their right to object to a court ruling and may vigorously advocate their positions before the appropriate tribunal, both the dignity of the court and the orderly functioning of the judicial system necessitate prompt adherence to the writ of the court.

The famous case of *Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) underlines the vigor of the collateral bar rule. In *Walker*, a group of leading civil rights activists planned a march through Birmingham on Good Friday to decry the racial discrimination that was the hallmark of Jim Crow. City officials sought, and obtained, an injunction from the state circuit court against the protest. *Id.* at 308, 87 S.Ct. at 1825. Petitioners, perceiving the unconstitutionality of the order, disregarded the injunction. They were slapped with a contempt order and subsequently sentenced to five days in jail. Although the ordinance was subsequently struck down as violative of the First Amendment,[9] the Supreme Court nonetheless upheld the contempt citation. "The rule of law that Alabama followed in this case reflects a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion." *Id.* at 320–21, 87 S.Ct. at 1831–32. There can be little doubt that the cause espoused by the *Walker* petitioners represented the highest ideals and aspirations of our constitutional vision; there can be equally little doubt that the Birmingham ordinance unconstitutionally served racial injustice. But even in a case where the equities cut so dramatically in favor of the accused contemnors, the Supreme Court came down on the side of the orderly rule of law.[10]

There are, of course, exceptions to the collateral bar rule.[11] Federal courts have recognized at least three. The most frequently invoked deviation is that for orders resting upon a defective jurisdictional base. If a court order issues without personal or subject matter jurisdiction, the decree may be violated without incurring the penalty of criminal contempt. *See Maness*, 419 U.S. at 459, 95 S.Ct. at 591.[12] In such a case,

---

9. *See Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965).

10. The rule of *Walker* and the Court's reliance on the "civilizing hand of law" has not gone uncriticized. *See, e.g.,* Burt, *Two Jewish Justices* 103–08 (1988). Professor Burt argues that it was not the demonstrators who threatened ordered liberty but courts which premised their institutional authority on "brute power" rather than the fairness and justice of their decisions. As Dr. Martin Luther King said at the time, "We do this not out of any disrespect for the law but out of the highest respect for the law. This is not an attempt to evade or defy the law or engage in chaotic anarchy. Just as in all good conscience we cannot obey unjust laws, neither can we respect the unjust use of the courts." We, of course, have not been called upon to revisit the particular facts and constitutional values underlying the Birmingham case nor are we empowered to reassess binding Supreme Court precedent.

11. The collateral bar rule applies only to criminal contempt charges. The invalidity of the underlying order is always a defense to a civil contempt charge. *United Mine Workers*, 330 U.S. at 295, 67 S.Ct. at 696.

12. The legacy of *United Mine Workers* is not completely clear on this point. While the case is now frequently cited for the proposition that a lack of jurisdiction is a complete defense to an

the original order is deemed a nullity, and the accused contemnor cannot be fairly punished for violating nothing at all. However, Hern Iron does not contend that the federal district court for Idaho lacked personal or subject matter jurisdiction with respect to its actions here.

Second, some federal courts have carved out a limited exception for court orders that are "transparently invalid." *See In re Providence Journal Co.*, 820 F.2d at 1347.[13] The foundation of this exception is that the contempt power is not a basis for a court to exceed the limits of its authority. According to proponents of this exception, even a court of proper jurisdiction lacks the naked power to reduce constitutional rights without a colorable basis in the law.

■ Neither the Supreme Court nor this circuit has yet recognized the second exception, and while we might ultimately prove amenable to such a rule, the question need not be answered here. Without deciding the legal issue, we can freely conclude that the warrant at issue here was not plainly invalid. Appellant's Fourth Amendment claim turns upon a technical, indeed legalistic, analysis of the warrant application. Hern Iron does not contend that the district court's action violated either clearly settled precedent in this circuit or egregiously transgressed some basic norm. Without a

far greater showing that the normal limits of judicial authority was flouted, a warrant cannot fall under this exception.

■ Third, and perhaps most significant, appellant argues that the warrant falls under the exception to the collateral bar rule first outlined in *Maness*, 419 U.S. at 460, 95 S.Ct. at 592. *Maness* involved an order for production of allegedly obscene materials pursuant to a subpoena *duces tecum*. Petitioner was a lawyer. He advised his client, a newsstand owner who had recently been convicted of selling obscene material in violation of a local ordinance, that compelled production of the magazines would violate the Fifth Amendment. The newsstand owner refused to turn over the magazines, and ultimately, both attorney and client were held in contempt. Although petitioner counseled violation of a facially valid court order, the Supreme Court reversed the convictions. "When a court during trial orders a witness to reveal information, ... a different situation may be presented. Compliance could cause irreparable injury because appellate courts cannot always 'unring the bell' once the information has been released. Subsequent appellate vindication does not necessarily have its ordinary consequence of totally repairing the error." *Id.* The court, in a unanimous vote,[14] vacated the contempt citation.[15]

---

order of contempt, *In re Providence Journal Co.*, 820 F.2d at 1347 n. 29, some commentators have interpreted the case as standing for the opposite principle. *See* C.A. Wright, *Law of Federal Courts* § 16. In the words of Professor Chafee, both the Court and readers of the opinion have evidenced "a lack of impressive solidity on this point." Chafee, *Some Problems of Equity* 367 (1950).

13. *See also United States v. Dickinson*, 465 F.2d 496, 509–10 (5th Cir.1972).

14. Although all nine justices concurred in the result, Justices Stewart, Blackmun, and White wrote separately to express different legal theories of the case.

15. There is a strain in our law that runs contrary to the general proposition that court orders must always be obeyed. In the limited area of civil discovery, we permit aggrieved parties to disobey certain orders and seek immediate review by contempt proceedings or otherwise. *See Newton v. National Broadcasting*

*Co.*, 726 F.2d 591, 593 (9th Cir.1984). Since a post-trial appeal would not afford the injured party a meaningful remedy, contempt proceedings are sometimes the litigants only method for obtaining effective review. *See also United States v. Ryan*, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971). In *Ryan*, the Supreme Court noted that its holding of contempt in *Walker* turned upon the adequacy of earlier review. "*Walker v. Birmingham* ... is not to the contrary. Our holding that the claims there sought to be asserted were not open on review of petitioners' contempt convictions was based upon the availability of review of those claims at an earlier stage." *Id.* at 532 n. 4, 91 S.Ct. at 1582 n. 4. *See also* Wright, *Federal Courts* § 16. With respect to administrative search warrants, no question exists as to whether there has been an opportunity for an adequate judicial determination prior to the time for compliance. The Supreme Court has held that a good faith warrant application by the government and plenary review by the magistrate is sufficient to safeguard constitutional rights in the criminal con-

Although several commentators have argued for the application of the *Maness* exception to deliberate violations of ex parte injunctions restraining First Amendment speech rights, *see* Labunski, *The "Collateral Bar" Rule and the First Amendment: The Constitutionality of Enforcing Unconstitutional Orders*, 37 Amer.L.Rev. 323 (1988); Rendleman, *More on Void Orders*, 7 Ga.L.Rev. 246 (1973); *compare Walker*, 388 U.S. at 321, 87 S.Ct. at 1832, thus far, the exception has not extended beyond the limited confines of self-incrimination. Appellant argues, however, that the "cat out of the bag" theory is equally applicable in the context of ex parte warrants.

Hern Iron makes two alternative arguments. Its first and principal argument is that *Maness* should be applied in the Fourth Amendment context, and the company should be permitted to raise the insufficiency of the warrant as a defense to the contempt citation. Otherwise, the argument goes, appellant's Fourth Amendment rights would be irrevocably lost without an opportunity to vindicate those important values in court.

Hern Iron's argument has a certain appeal. We are aware that ordinarily, search warrants must be promptly obeyed and that criminal suspects may not bar entry into their homes on the ground that a police warrant may be defective. However, in the criminal context, the exclusionary rule serves to protect the injured party against the consequences of violations of his Fourth Amendment rights. Although the violation may never be fully redressed, the adverse legal consequences of the improper search can be fully neutralized. Here, on the other hand, without the protections afforded by the exclusionary rule, the fruits of an unconstitutional search could be used against Hern Iron whether or not the government's search was unconstitutional. Since the company could not seek to suppress the evidence, Hern Iron contends that the only effective way to insure against constitutional injury is post-

poning enforcement of the administrative warrant until after a hearing can be held on the legal issues.

There are, however, considerable difficulties with appellant's basic argument. OSHA's inspection plan relies heavily upon prompt access to businesses and their operations. The agency's ability to carry out its mandate to enforce the health and safety requirements of the Occupational Safety and Health Act turns upon the tactical advantages of surprise. "While the dangerous conditions outlawed by the Act include structural defects that cannot be quickly hidden or remedied, the Act also regulates a myriad of safety details that may be amenable to speedy alteration or disguise." *Barlow's, Inc.*, 436 U.S. at 316, 98 S.Ct. at 1822. The statutory scheme hinges upon unannounced access to business premises. 29 U.S.C. § 657(a). Indeed, giving advance notice of OSHA inspections is a criminal offense under the Act. 29 U.S.C. § 666(f). Permitting owners and operators to litigate the validity of inspection warrants—prior to their enforcement—would seriously frustrate the purpose of the Act. As defense attorneys plow the court under mountains of papers, management could make the cosmetic changes necessary to hide dangerous defects and avoid serious penalties.

OSHA's own experience with Hern Iron illustrates the success of this strategy for a corporation and the hazards for the General Schedule System. The last OSHA inspection of Hern Iron took place approximately three years after the issuance of the initial warrant. In the interim, the long march through the legal system nullified OSHA's tactical advantage of surprise. Appellant had ample notice and sufficient time to make any changes, temporary or otherwise, necessary to evade penalties. Since one of the purposes of a random search system is to insure surprise, delaying tactics would serve the objectives of the offending employer. Moreover, not only would OSHA be unable to punish of-

text. We do not think the requirements are different with respect to an administrative

search warrant.

fenders, the deterrent value of surprise inspections for all businesses would be substantially reduced. Such a departure from its basic procedures would seriously jeopardize OSHA's mission of health and safety enforcement.[16]

In the administrative search warrant cases, unlike in *Maness*, the adverse consequences of delaying enforcement are predominant. Moreover, in the search warrant cases, a neutral and detached magistrate will have had the opportunity to examine the reasonableness of the proposed search.[17] Such an inquiry focuses on the information in the possession of those seeking the warrant rather than on the actual conduct of the party to be searched. Thus, an adequate inquiry can be conducted without the direct participation of the latter. In the case of a Fifth Amendment violation, however, the party whose rights are at stake may be necessary to the inquiry. The focus in such cases is on the material to be disgorged rather than on the reasonableness of the officer's conduct. These distinctions are sufficient to persuade us that the *Maness* exception should not be extended to search warrant cases, whether the proceedings involved are criminal or administrative in nature.

**16.** In previous cases, we have, in upholding both the OSHA search warrants and findings of contempt, analyzed the validity of the underlying warrant. *See, e.g., Donovan v. Burlington Northern Inc.,* 694 F.2d 1213 (9th Cir.1982); *Stoddard Lumber Co. v. Marshall,* 627 F.2d 984 (9th Cir.1980). The fact that we have done so in past cases does not compel us to do so here. There is no indication that in the earlier cases we considered whether it was *necessary* for us to decide the questions relating to the validity of the warrant. Having reviewed the matter fully here, we conclude that the proper course is to proceed directly to the contempt issue.

**17.** Hern Iron claims that OSHA was animated by animosity derived from the repeated conflicts between John Hern and local administrators. Since the issuing magistrate or judge is limited by the record available in the ex parte hearing, *see Donovan v. Burlington Northern Inc.,* 694 F.2d 1213, 1215 (9th Cir.1982), the court is on occasion hamstrung in the full evaluation of the record. We are aware that when OSHA pursues a pattern of selective prosecution, the targeted company is not without judicial remedies. *See infra* n. 19.

As an alternative to his principal contention, counsel for appellant, at oral argument, vigorously urged the court to extend the exclusionary rule to civil OSHA proceedings. This would, the argument goes, provide the subject of the search with a forum in which to raise the constitutional issue and permit the court to correct the erroneous warrant. In such cases, there would be no need to extend *Maness*.

As a general rule, the exclusionary rule does not attach to civil or administrative proceedings. *See INS v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (refusing to apply exclusionary rule in immigration proceeding). *See also United States v. Janis,* 428 U.S. 433, 447, 96 S.Ct. 3021, 3028–29, 49 L.Ed.2d 1046 (1976). However, neither Hern nor OSHA has pointed to any relevant authority directly settling the question whether the exclusionary rule applies to OSHA administrative hearings. *Cf. Todd Shipyards Co. v. Secretary of Labor,* 586 F.2d 683, 689 (9th Cir.1978).[18] While, in this type of case, the right to invoke the exclusionary rule at an administrative proceeding would carry a reassuring aura of fairness, we are not in a position to decide the question in the context of a contempt case.[19]

**18.** In *Janis,* the Supreme Court held that the exclusionary rule was inapplicable in a civil action seeking a refund from the Internal Revenue Service. The Court held that the social cost of the exclusionary rule outweighed its deterrent effect. This test was applied in *Lopez–Mendoza* to bar the exclusionary rule in immigration proceedings. Given the relevant case law, we think it unlikely that the exclusionary rule would in the future be applied to OSHA violation proceedings.

**19.** Even absent an exclusionary rule in OSHA proceedings, we are not convinced that Hern Iron would be entirely without remedies if its complaints were justified. For instance, the company might seek declaratory or injunctive relief against enforcement of the plan in a suit under the Administrative Procedure Act. Similarly, if, as Hern Iron suggests, the inspection was part of a plan of harassment against the company and the views of its president, a *Bivens* action might be brought against OSHA and its inspection officials.

## III. CONCLUSION

The collateral bar rule is a cornerstone of a system of orderly and efficient adjudication. District courts, like courts of appeal, are fallible; however, our system is premised on the simple fact that orders, once issued, must be respected. If litigants were able to disobey the duly ordered judgments of the courts at will, the integrity of the judicial system—as well as the effectiveness of the administrative search system constructed by Congress—would be substantially undermined. The finding of criminal contempt is

AFFIRMED