**REEBOK INTERNATIONAL LIMITED** (a Massachusetts corporation) and Reebok International Limited (a limited company of the United Kingdom), Plaintiffs–Appellees,

v.

Byron McLAUGHLIN a/k/a Beck Marketing Agency a/k/a Beck Buying Group, et al., Defendants,

and

Banque Internationale A Luxembourg S.A., Appellant.

No. 93–55961.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1995.

Decided March 6, 1995.

1388

Lawrence M. Harnett, Marks & Murase, New York City, and Matthew E. Digby, Marks, Murase & White, Los Angeles, CA, for appellant.

Harley I. Lewin, Lewin & Laytin, New York City, and Bennett A. Bigman, Stein & Kahan, Santa Monica, CA, for plaintiffs-appellees.

Before: TROTT, FERNANDEZ and T.G. NELSON, Circuit Judges.

FERNANDEZ, Circuit Judge:

Banque Internationale a Luxembourg S.A. ("BIL") appeals the district court's orders summarily holding it in contempt[1] and assessing sanctions against it in the amount of $2,680,417.30. BIL argues that the district court had neither subject matter nor personal jurisdiction over it. Because we agree that the district court lacked personal jurisdiction over BIL, we reverse.

## BACKGROUND FACTS

Reebok International Limited brought suit against Byron McLaughlin for violations of the Lanham Act in allegedly counterfeiting Reebok footwear. Mr. McLaughlin controlled various corporations, including the Heatherdale Corporation. As a result of the lawsuit, Reebok obtained a temporary restraining order in the district court which enjoined "the defendants and their officers, servants, employees and agents and any per-

---

1. *Reebok Int'l Ltd. v. McLaughlin,* 827 F.Supp.   622 (S.D.Cal.1993) (*Reebok I*).

sons in active concert or participation with them" from "transferring, disposing of, or secreting any money, stocks, or other assets of these defendants without prior approval of the court." It also enjoined banks from transferring funds of the defendants which were in the banks' hands. On November 29, 1989, a copy of the TRO was served on BIL in Luxembourg. BIL is a banking corporation with its principal place of business in Luxembourg. It has no physical presence in California nor does it transact any banking business in the United States. BIL sent some letters to Mr. McLaughlin at his address in California acknowledging the receipt of funds. Mr. McLaughlin also made several telephone calls to BIL during December 1989.

On December 6, 1989, Mr. McLaughlin's wife Brigitte—at his request—appeared at BIL's office in Luxembourg and presented the proper documentation to take control of all of the funds in the Heatherdale account, which amounted to approximately $2,400,000. Those funds were in a time deposit that did not mature until January 8, 1990. Although BIL would normally have honored the request for early release, it instead told Ms. McLaughlin that it would retain the funds until they became due. At that time, BIL was prohibited by Luxembourg banking secrecy laws from informing Reebok of Ms. McLaughlin's efforts to remove the funds. It was also compelled by Luxembourg law to release funds upon proper requests from depositors. Ms. McLaughlin, through Luxembourg counsel, challenged BIL's retention of the funds. BIL's in-house counsel, Jean-Jacques Rommes, advised BIL that Ms. McLaughlin had a right to withdraw the funds because the TRO had not been properly registered as a valid judgment (exequatur) or as an order for attachment (saisie-arret) under Luxembourg law.

BIL then negotiated a compromise with Ms. McLaughlin in which the funds would be transferred to a new account, but would still remain within the bank pending further legal developments—for example, the proper registration of the TRO in Luxembourg. BIL created the Bawnmore corporation and account and transferred the majority of the Heatherdale monies into that account, which was also ultimately controlled by Mr. McLaughlin. Later, BIL released approximately $117,000 from the Bawnmore account as interest and as part of the negotiated agreement with Mr. McLaughlin that the principal amount of the Heatherdale funds would remain at BIL.

Meanwhile, Reebok was attempting to have the TRO recognized by the Luxembourg courts. It failed in its attempt to obtain a saisie-arret, and then pursued other remedies available under articles 806 and 807 of the Luxembourg Code of Civil Procedure, which were also denied. At no time did the TRO ever become an enforceable judgment or an attachment under Luxembourg law.

In February of 1990, Mr. McLaughlin informed BIL that he would sue in Luxembourg for the right to remove his funds. This lawsuit was known as the "Heatherdale Lawsuit." BIL made an oral opposition. The result of the suit was the "Heatherdale Order," which instructed BIL to release the funds because the TRO was not legally valid in Luxembourg. Shortly thereafter, BIL released approximately $2,500,000 to Mr. McLaughlin.

Reebok then brought a contempt motion against BIL on January 22, 1992. It contended that BIL should be held in contempt for releasing the funds with knowledge of the restraining order. On May 28, 1992, the district court dismissed Reebok's motion on grounds that BIL's actions were compelled by Luxembourg law, namely the Heatherdale Order, and BIL did not have the requisite intent for aider and abettor liability under Federal Rule of Civil Procedure 65(d).

On July 22, 1992, Reebok brought a motion for reconsideration of the dismissal based on new evidence. On April 27, 1993, the district court granted Reebok's motion for reconsideration and held BIL in contempt. *Reebok I,* 827 F.Supp. at 628–29. Thereafter the district court fixed compensatory sanctions in the amount of $2,680,417.30, which presumably were payable to Reebok, although the order did not explicitly say so. This appeal ensued.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.

■ The existence of subject matter jurisdiction is a question of law reviewed *de novo.* See *Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.,* 20 F.3d 987, 990 (9th Cir.1994).

■ A district court's determination that personal jurisdiction can properly be exercised is a question of law reviewable *de novo* when the underlying facts are not disputed. See *Bourassa v. Desrochers,* 938 F.2d 1056, 1057 (9th Cir.1991). The district court's factual findings on all jurisdictional issues must be accepted unless clearly erroneous. See *Kruso v. International Tel. & Tel. Corp.,* 872 F.2d 1416, 1421 (9th Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).

■ A district court's civil contempt order is reviewed for an abuse of discretion. See *In re Dual–Deck Video Cassette Recorder Antitrust Litig.,* 10 F.3d 693, 695 (9th Cir. 1993). A district court's decision to impose sanctions or punishment for contempt is also reviewed for abuse of discretion. See *Securities and Exch. Comm'n v. International Swiss Invs. Corp.,* 895 F.2d 1272, 1277 (9th Cir.1990).

## DISCUSSION

When all is said and done, the resolution of this case turns on jurisdictional issues. BIL asserts that the district court had neither subject matter nor personal jurisdiction over it. We disagree with the former assertion but find merit in the latter one.

### A. Subject matter jurisdiction

■ BIL argues that the district court should not have exercised subject matter jurisdiction over its actions in Luxembourg under the "jurisdictional rule of reason" articulated in *Timberlane Lumber Co. v. Bank of Am.,* 549 F.2d 597, 613 (9th Cir.1976). However, in that case we were not deciding the nature of a district court's subject matter jurisdiction over its own orders. Rather, we determined whether United States antitrust laws may be applied to actions occurring in other nations, and in so doing listed several factors to be considered.[2] The *Timberlane* factors are generally used to analyze whether a particular United States law may bind parties acting in other nations. For example, this court has held that the Lanham Act may properly be applied to foreign defendants' activities outside the United States. See *Reebok Int'l, Ltd. v. Marnatech Enters.,* 970 F.2d 552, 554–57 (9th Cir.1992).

Those authorities do not lend support to BIL's claim that the district court had no subject matter jurisdiction in this case. District courts do, and must, have the authority to punish contemptuous violations of their orders. 18 U.S.C. § 401. See also *International Union, United Mine Workers v. Bagwell,* —— U.S. ——, ——, 114 S.Ct. 2552, 2559, 129 L.Ed.2d 642 (1994) (noting that "[c]ourts independently must be vested with 'power to impose ... submission to their lawful mandates ...'" and thus have "an inherent contempt authority") (citation omitted); *cf. Republic of the Phil. v. Westinghouse Elec. Corp.,* 43 F.3d 65, 72–80 (3d Cir.1994) (where foreign government was a party, district court could impose sanctions upon it, but comity precluded injunctive relief). Thus, the district court did have *subject matter* jurisdiction to determine if its TRO had been violated.

### B. Personal jurisdiction

■ BIL next argues that it could not be held in contempt because the district court did not have personal jurisdiction over

---

**2.** The elements to be weighed include the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.
*Timberlane,* 549 F.2d at 614.

it. For a defendant to be subject to general *in personam* jurisdiction, it must have such continuous and systematic contacts with the forum that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *See Core–Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1485 (9th Cir.1993). If a defendant's contacts with the forum are not continuous and systematic, the forum may exercise only specific jurisdiction, which is determined by the following three-part test:

(1) The nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Core–Vent*, 11 F.3d at 1485.

■ The district court's order properly indicated that "personal jurisdiction, if it exists at all, arises out of specific jurisdiction, as clearly there is no general jurisdiction over BIL." *Reebok I*, 827 F.Supp. at 624.[3] It went on to note that "it would not be appropriate to say that BIL does business in California, or in the United States for that matter...." *Id.* The district court mentioned that BIL "does accept money from citizens of this country and of this state." *Id.* But the court found that the "essential contact" giving rise to personal jurisdiction was BIL's conduct in "assisting" Mr. McLaughlin's violation of the injunction. *Id.* at 624. It then found that "to the extent that minimum con-

tacts are required, personal jurisdiction over a non-party in a case such as this one may [be] found by construing the non-party's act of assisting in the violation of an injunction as a 'super-contact.'" *Id.*

In finding this "super-contact," the district court relied on the Fifth Circuit's decision in *Waffenschmidt v. MacKay*, 763 F.2d 711, 714 (5th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986). In that case, the Fifth Circuit found that "[n]onparties who reside outside the territorial jurisdiction of a district court may be subject to that court's jurisdiction if, with actual notice of the court's order, they actively aid and abet a party in violating that order." *Id.* The Fifth Circuit based its decision on both the inherent authority of a court to enforce its injunctions and the idea that a knowing violation of an injunction would make litigation in the forum that issued it foreseeable, and therefore within the notions of fair play and substantial justice. *See id.* at 716–18, 721–23; Fed.R.Civ.P. 65(d). Although *Waffenschmidt* speaks in expansive terms, it was speaking about the authority of district courts within the United States. The court grounded its decision on the simple fact that the "mandate of an injunction issued by a federal district court runs nationwide...." *Id.* at 716. That being so, the court could hold enjoined parties in contempt, no matter in what state they violated the court's orders. *Id.* As the court went on to say: "The nationwide scope of an injunction carries with it the concomitant power of the court to reach out to nonparties who knowingly violate its orders." *Id.* at 717. Once the court accepted that proposition, it is not surprising that it determined that a national court which could issue nationwide orders could also reach out and enforce those orders on a nationwide basis by taking personal jurisdic-

---

3. Hence, the district court recognized that this is not a case concerning the failure of a foreign bank with United States branches to comply with a federal district court's orders. *Cf. In re Grand Jury Proceedings (United States v. Bank of Nova Scotia),* 691 F.2d 1384 (11th Cir.1982) (permitting federal district court to hold in contempt a foreign bank with a Miami, Florida office for failing to comply with subpoena duces tecum directed at documents located at the bank's Bahamas branch, compliance with which would

subject the bank to criminal sanctions in the Bahamas), *cert. denied,* 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983); *In re Grand Jury Proceedings (United States v. Bank of Nova Scotia),* 740 F.2d 817 (11th Cir.1984) (affirming order of contempt and $25,000 per day fines in a case where noncomplying foreign bank had not produced documents requested in a subpoena duces tecum served on bank's Miami, Florida office), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 778, 83 L.Ed.2d 774 (1985).

tion over violators. Of course, in *Waffenschmidt* the individuals held in contempt had accepted assets from the enjoined party after they knew that he was enjoined from transferring those assets. *Id.* at 723.

▮▮▮▮ A finding of personal jurisdiction over the violators in that instance may be sound, even necessary. But the strength of the analysis begins to crumble when a district court seeks to reach out across the Atlantic in an attempt to impose conflicting duties on another country's nationals within its own borders. It is a general principle that one state cannot require a person "to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national," nor can the person be required to refrain from an act that is required. Restatement (Third) of the Foreign Relations Law of the United States § 441(1)(a) (1987). *Cf. In re Establishment Inspection of Hern Iron Works,* 881 F.2d 722, 726 n. 11 (9th Cir.1989) ("The invalidity of the underlying order is always a defense to a civil contempt charge."). The record demonstrates that Luxembourg banking law[4] normally compels both the release of depositors' funds on demand and strict secrecy regarding bank accounts. At the very least, those banking laws meant that BIL was subjected to conflicting legal demands, but that would assume that the TRO had some force in Luxembourg. In fact, however, the TRO had no effect in Luxembourg because it was never registered there.

Unless recognized by the Luxembourg government, foreign judgments do not have any force in that country. Reebok's own Luxembourg law expert, Andre Marc, testified that the TRO "was not an enforceable title in Luxembourg." *Cf. Hilton v. Guyot,* 159 U.S. 113, 227, 16 S.Ct. 139, 168, 40 L.Ed. 95 (1895) ("[J]udgments rendered ... in ... [a] foreign country ... are not entitled to full credit and conclusive effect when sued upon in this country, but are prima facie evidence only of the justice of the plaintiff's claim."). Reebok tried to have its TRO recognized

under the laws of Luxembourg but was ultimately unsuccessful. We are not sure of where Reebok's attempts went awry, but it appears that the Luxembourg courts were not satisfied that the temporary restraining order reflected a judgment or a claim that was certain and due. Without an enforceable order, Reebok had no business crying foul over any steps BIL took to avoid turning over all of Mr. McLaughlin's funds immediately upon demand. BIL explains that its reasons for setting up the "Bawnmore" account were to try to honor Mr. McLaughlin's rights under Luxembourg law and to try to give some deference to the TRO at the same time. The new account, and the $117,000 release, were subtended by BIL's attempt to keep control of the principal of the Heatherdale funds until the TRO's status became definite under Luxembourg law. If its explanation is correct, BIL went above and beyond the call of duty when it tried to buy time from Mr. McLaughlin despite its own obligations under Luxembourg law. Even if the explanation is not accepted, no force was added to the TRO as a result.

In any event, BIL's duties became absolutely clear after the "Heatherdale Order" was issued. That order declared that the district court's TRO did not affect BIL's obligation to release Mr. McLaughlin's funds and required BIL to release those funds immediately. It would defy logic were we to decide that the district court could hold BIL in contempt for complying with the order of the Luxembourg court. The district court, however, found that BIL had somehow colluded with Mr. McLaughlin in bringing a sham lawsuit which resulted in the Heatherdale Order. That, the court thought, effectively avoided the injunction's mandate because a court order was obtained which instructed BIL to do exactly the opposite of what the TRO commanded.

In so deciding, the district court first looked at correspondence between Mr. McLaughlin and his lawyer: "'As to the suit that HEATHERDALE was to bring against

---

**4.** Matters of foreign law may be determined by the court, which may consider any relevant material or source, including testimony. *See* Fed. R.Civ.P. 44.1; *Stuart v. United States,* 813 F.2d

243, 250–51 (9th Cir.1987), *rev'd on other grounds,* 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989).

the Bank, Mr. Rommes [BIL's in-house counsel] agrees to it.'" *Reebok I*, 827 F.Supp. at 627. The court noted that this evidence could be viewed in two ways: either BIL was trying to appease Mr. McLaughlin by telling him that he would need a court order before it would release his funds, or BIL actively suggested that Mr. McLaughlin proceed to a Luxembourg court to obtain an order as a way of minimizing BIL's liability. The district court chose the latter version. We fail to see the significance of either reading. The TRO was still not registered in Luxembourg. Given that situation, it was reasonable for BIL to want a lawsuit brought to determine its obligations once and for all. Even if BIL "agreed" to the lawsuit, or "suggested" that Mr. McLaughlin file one, those actions could not, by themselves, subject it to the jurisdiction of the district court. There could be nothing wrong in advising Mr. McLaughlin that he must follow the law in Luxembourg if he wanted his money. Indeed, Reebok should have understood that it had to do the same thing, if it wanted to keep the money from him.

The district court also found that, during the Heatherdale lawsuit, BIL "remained silent,"[5] which allowed Mr. McLaughlin to convince the Luxembourg court that the release of the funds would be appropriate. The district court found that BIL should have "at a minimum, informed the Luxembourg court of the United States order ... and given the Luxembourg court the opportunity to order the release of the funds with full knowledge of the facts." *Id.* at 628. But it is undisputable that the Heatherdale court had full knowledge of the TRO's existence. The Heatherdale Order specifically stated:

> B.I.L. has been served a temporary restraining order issued by a California court on November 27, 1989 prohibiting all banks and generally any other financial

institutions from releasing the funds held by HEATHERDALE CORPORATION.

. . . . .

> Since the measures taken abroad against HEATHERDALE CORPORATION have only a territorial effect and since the opposition served on B.I.L. was not done in the form of a proper attachment, supported by a title enforceable in Luxembourg or the permission of a Luxembourg judge, they cannot be considered valid or effective....

> Therefore, B.I.L.'s blockage of the account must be considered improper....

As can be seen from the language of the Heatherdale Order, the district court's finding that BIL's act of "hiding" the TRO from the Luxembourg court subjected it to personal jurisdiction was clearly erroneous. The Heatherdale Order was issued with full knowledge of both the TRO and its ineffectiveness under Luxembourg law. The fact that Luxembourg refused to honor the district court's injunction excused BIL from having to comply with it; Reebok cannot now turn to the United States district court to punish BIL for complying with its own country's statutory and judicial law within that country. The injunctive power of a federal district court cannot extend *that* far. BIL's "violation" of the injunction did not subject it to personal jurisdiction in California because it was under no obligation to comply in the first place.[6]

■ In fine, we do not agree that when a national of a foreign country follows the law of that country in that country it can be dragged halfway around the world to answer contempt charges arising out of a foreign court's ineffective order. But, at the risk of being unduly repetitious, we will put our discussion into the more traditional terms outlined in *Core–Vent*, 11 F.3d at 1485.[7]

---

5. The district court apparently concentrated on the fact that BIL did not file a written opposition to the Heatherdale lawsuit. However, BIL points out that, under Luxembourg law, the Heatherdale lawsuit was a summary proceeding primarily oral in nature. Proceedings of that nature are far from unknown in the courts of this country. Indeed, they are common. The lack of a written submission should not have been of any consequence. In any event, BIL clearly did not

"remain silent," even if it did have a duty to respond, which is questionable.

6. Because we hold that there was no personal jurisdiction, we do not consider whether the lack of an evidentiary hearing violated BIL's due process rights.

7. Where there is no federal statute governing personal jurisdiction, we look to the law of the state in which the district court sits. *Core–Vent,*

■ A national of a foreign country—BIL—followed the law, including a court order, of its own country—Luxembourg—when it did acts within that country. It did that rather than following an order from a court of another country—the United States—which had no legal effect in Luxembourg. Can it be said that BIL has purposefully directed its activities toward the United States? *Id.* at 1485–87. To ask the question is to answer it and to do so in the negative. It is pellucid that BIL has simply behaved as any rational law-abiding person would. It has obeyed the only law applicable to it—the law of its sovereign. If that can be said to have had an effect in the United States, it still cannot be said that the action was purposefully directed toward the United States. At least that cannot be said without wrenching language out of its normal channel and distorting meaning beyond measure. Nor can we say that the fact that BIL had calls and contacts with its depositor, who was demanding the deposited funds, makes one whit of difference. Nor do we see anything sinister in the fact that the Heatherdale Order was obtained without notice to Reebok, even though the parties and the Luxembourg court knew that Reebok had more than a passing (though not legally recognized) interest in the litigation. For a variety of reasons, courts do not always proceed slowly and with widespread notice. After all, the TRO for which Reebok seeks an international reach was based upon a sealed file and was obtained *ex parte* without notice to anyone at all.

It follows that it cannot be said that a contempt claim for not following the TRO could be said to be connected to BIL's forum-related activities. *Id.* at 1485.

■ Finally, it could not be said that under these circumstances bringing BIL across the sea to answer for its conduct in its own land would "'comport with fair play and substantial justice....'" *Id.* (citation omit-

ted). In *Core–Vent* we outlined the factors that support that determination. *Id.* at 1487–90. We will touch on them now. BIL's injection into the affairs of the United States was nil, the burden on BIL would be very great under the circumstances, and the conflict with the sovereignty of Luxembourg could hardly be more sharp. BIL would be mulcted for more than $2,680,000 for obeying the law of Luxembourg. What state could tolerate that? Going on with the list of traditional factors, we cannot deny that the issuing court has an interest in adjudicating the dispute, though we say that with some hesitation given the facts of the case. Undoubtedly the district court would be an efficient place to decide the contempt issue, and is probably the only place where it could be litigated. On the other hand, if Reebok truly thinks that BIL did not properly adhere to the law of Luxembourg when the funds were released to Mr. McLaughlin, it can, no doubt, raise the issue there. That is the country where all of the relevant events took place. Thus, on balance, fairness also dictates that personal jurisdiction must fail in this case.

### CONCLUSION

As federal judges we can readily sympathize with the district court's desire to have its injunctive order respected. We, like it, do not readily embrace the idea that the power of the United States courts can be thwarted; indeed, we embrace that reality with velleity. We also sympathize with Reebok's desire to keep an infringer from his ill-gotten gains. Nevertheless, there *are* limits to the district court's reach, and those limits became palpable when the court sought to extend its arm into the territory of another nation and to impose discordant duties upon the subjects of that nation whose actions were solely within its own borders.

There can be no doubt that Luxembourg both imposed legal duties upon BIL and refused to recognize the TRO, even though

11 F.3d at 1484. Here, as in *Core–Vent,* Reebok brought its case in a federal district court sitting in California. California's long-arm statute allows courts to exercise personal jurisdiction to the extent permitted by the Due Process Clause of the United States Constitution. Thus we need only determine whether the district court's exer-

cise of personal jurisdiction over BIL meets the requirements of due process. *Id.; cf. Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 414–16 (9th Cir.1977) (applying Nevada "long-arm" personal jurisdiction statute to Liechtenstein national accused of violating the Lanham Act).

the Luxembourg courts were well aware of that TRO's existence. As a matter of fact, those courts had specifically rebuffed Reebok's attempts to vitalize the TRO within that nation's borders. We do not stop to decide whether the failure to register can be laid entirely at the feet of Reebok; it just does not matter. The Luxembourg courts also ordered BIL to follow Luxembourg law and to release the funds. When BIL·obeyed those orders of a court of its own nation, it did not thereby subject itself to the personal jurisdiction of the district court.

On the facts of this case, we cannot arrogate to the federal courts the power to control the banking systems of other countries within their own territory. Again, we understand the district court's frustration and its reaction in the heat of the fray. But from our more remote coign of vantage it is clear that the contempt order cannot stand.

**REVERSED.**