86 F.3d 1165
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sherman C. SMITH, Defendant-Appellant.
 No. 93-35084.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 11, 1995.
Decided May 20, 1996.
 
 Before: HALL, WIGGINS, and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Smith appeals from a district court order affirming the Interior Board of Land Appeals' administrative decision declaring Smith's mining claim null and void, and holding Mr. Smith in contempt for mining his claim in violation of a district court order.
 
 
 3
 I. The Administrative Decision.
 
 
 4
 The issue which controlled the outcome in the administrative proceedings was whether Mr. Smith had located "valuable mineral deposits," 30 U.S.C. § 22, or mere "common varieties of ... stone." 30 U.S.C. § 611. It is the "continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining ..." 30 U.S.C. § 21a. Under the Mining Law of 1872, still in force, "all valuable mineral deposits in lands belonging to the United States" are open to exploration and purchase under Department of Interior regulations. 30 U.S.C. § 22. "The intent of these laws is to reward and encourage the discovery of minerals that are valuable in an economic sense." Ideal Basic Indus., Inc. v. Morton, 542 F.2d 1364, 1369 (9th Cir.1976).
 
 
 5
 There is an exception to the Mining Law of 1872, called the Common Varieties Act, that prevents mining claims from being exploited for "common varieties of ... stone." See 30 U.S.C. § 611 ("No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws...."). In deciding whether a particular mineral is a "common" or "uncommon" variety, courts look to a number of factors centering around the mineral's intrinsic qualities. See McClarty v. Secretary of Interior, 408 F.2d 907, 908-09 (9th Cir.1969) (requiring courts to use a five-part test that, among other things, involves comparing the deposit at issue with other deposits to determine whether the deposit at issue has any "unique properties").
 
 
 6
 The "common variety" exception itself contains an exception, however, for common varieties of stone "ha[ving] some property giving [them] distinct and special value." Id. The Secretary has attempted to define this exception. See 43 C.F.R. § 3711.1(b) (listing six factors including the "quality and quantity of the deposit, geographical location, proximity to market or point of utilization, accessibility to transportation, requirements for reasonable reserves," and "feasible methods for mining and removal of the material").
 
 
 7
 Travertine, the variety of limestone in Mr. Smith's deposit, does not automatically fall within or without the "common varieties" exception or the exception to that exception. While the Secretary has mentioned limestone in a regulation, she has not done so in a way decisive to the outcome of this case. See 43 C.F.R. § 3711.1(b) ("Limestone suitable for use in the production of cement, metallurgical or chemical grade limestone, gypsum, and the like are not 'common varieties.' "). Moreover, we have held that even though building stone might ordinarily be a common variety not locatable, "certain kinds of building stone are still subject to location under the mining laws" because of unique properties or special value. McClarty, 408 F.2d at 908-09."
 
 
 8
 Taken together, the two controlling statutes require that in order to be locatable, mineral deposits must be "valuable," 30 U.S.C. § 22, and must contain other than "common varieties." 30 U.S.C. § 611. "The mere fact that minerals are uncommon varieties does not make them locatable, for they must also meet the requirements of the marketability rule. Conversely, even though a mineral may be extracted, removed, and marketed at a profit, it is not locatable if it is a common variety." 1 American Law of Mining § 8.01[a][i] (1995) (footnotes omitted). Some limestone is useful only in the manner of common varieties, but some is useful as building material, in metallurgy, as a soil amendment for gardening and farming, for making cement, and for other uses. In some but not all parts of the country, limestone exists in immense quantities. These circumstances "make it particularly difficult to lay down any general rules as to the locatability of limestone." Id. at § 8.01[c].
 
 
 9
 Most of Mr. Smith's evidence on the usefulness of his particular travertine deposit shows usefulness as a soil supplement for agriculture and horticulture. His limestone is therefore not clearly within or without the common varieties statute, in the absence of evidence or stipulation.
 
 
 10
 At Mr. Smith's hearing, the Common Varieties Act issue was stipulated away, and the hearing focused upon whether the travertine was "valuable" as required under the Mining Law of 1872. For purposes of the contest over Mr. Smith's mining claim, the government conceded that Mr. Smith had complied "with the applicable mining laws and regulations pertaining to staking, recording, and annual assessment work." The government also conceded that "[a]t least some travertine mineral found on REC # 2 is locatable under the mining laws, for use as a soil amendment." By "locatable," the stipulation meant, in context, that the travertine was not among the "common varieties of stone" excepted by the Common Varieties Act. This concession was made in a written stipulation of uncontested facts, and was evidently pursuant to a memorandum from the Deputy Regional Forester of the Department of Agriculture. The Deputy Regional Forester concluded, after consultation with other officials and review of various materials, that "limestone on the REC # 2 mining claim was a locatable mineral used as a soil amendment." The Regional Forester had previously determined that "at least some of the limestone on the REC # 2 mining claim is locatable, either as chemical grade limestone or as a soil amendment."
 
 
 11
 The administrative law judge concluded that Mr. Smith's mining claim was null and void. He did not make this finding under the Common Varieties Act. Rather, the administrative law judge was unpersuaded that Smith's claim was "valuable" under the Mining Law of 1872. Among the risks against which the Common Varieties Act protects public lands are people who use gravel pits as a pretext for acquiring title to suburban lands. Mr. Smith was not that kind of "miner." The administrative law judge expressly found that Mr. Smith "desires to develop a local source of ag lime." The issue on which Mr. Smith lost the case was whether he could get his lime to market inexpensively enough to compete with alternative sources of lime. The administrative law judge concluded that Mr. Smith's cost estimates were too optimistic, so he was unlikely to be able to price his product inexpensively enough to compete with agricultural lime from Seattle.
 
 
 12
 The Interior Board of Land Appeals also held that Mr. Smith's claim was null and void, but on an entirely different ground. The IBLA decided that "because the claim was not properly located under the mining law, the question of marketability decided by Judge McKenna is not reached." That is to say, IBLA did not reach the question upon which the result turned before the administrative law judge, whether Mr. Smith could exploit the mineral deposit profitably. Instead, the IBLA held that the limestone was a common variety. This decision required rejection of the stipulation to the contrary, a stipulation which the United States had made and the administrative law judge had accepted. The IBLA held that "there is no foundation for the stipulation," and found it ambiguous, and then held that the limestone had no unusual properties taking it out of the common varieties statute.
 
 
 13
 We review the IBLA decision to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Northwest Motorcycle Ass'n v. United States Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir.1994). An agency finding of fact is set aside if "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E). We conclude that it was arbitrary for the IBLA to reject the stipulation and decide the case on a basis contrary to the stipulation.
 
 
 14
 The IBLA erred in holding that the stipulation was ambiguous. The stipulation was included in a fifteen page written "stipulation of uncontested and contested facts," evidently prepared with care by counsel prior to the hearing. An on-the-record oral discussion was used to make its significance crystal clear:
 
 
 15
 The Court: Do I have a stipulation that the travertine on this claim has sufficient calcium carbonate content to be located under the mining laws?
 
 
 16
 Mr. Maynard [For the Govermment]: Your Honor, I would like to clarify that. What we're going to stipulate to is that there is at least some travertine that is of sufficient quality, sufficient carbonate content. I don't want to be stipulating that all of it is at a certain level of content. In fact, the evidence we'll present will show a variance, so I just want to clarify that point. So the stipulation would be that there is at least some travertine on this deposit that is of sufficient carbonate content to be located under the 1872 mining law.
 
 
 17
 The Court: So stipulated.
 
 
 18
 The IBLA also erred in its alternative ground for rejecting the stipulation, that no sufficient foundation was laid for it in the evidence. The ground makes no sense. Lawyers ordinarily do not prove stipulations or submit foundation for them, because that would obviate the value of stipulations. A stipulation conceding the truth of some alleged fact establishes the fact "so that the one party need offer no evidence to prove it, and the other is not allowed to disprove it. This is what is commonly termed a solemn--i.e., ceremonial or formal--or judicial admission, or stipulation. It is, in truth, a substitute for evidence, in that it does away with the need for evidence." 9 Wigmore on Evidence § 2588 (James H. Chadbourn rev. 1981) (emphasis in original) (footnote omitted); Sinicropi v. Milone, 915 F.2d 66, 68 (2d Cir.1990) ("Courts generally enforce stipulations that narrow the issues in a case.").
 
 
 19
 This is not to say that a stipulation cannot be rejected. The administrative law judge was not bound to accept the stipulation, and could have exercised his discretion to require evidence to lay a foundation for the stipulation. Sinicropi, 915 F.2d at 67. But he did not. Based upon the stipulation, the parties litigated only marketability, that is, whether the travertine was "valuable" under the Mining Law of 1872. They did not litigate whether the limestone was unlocatable under the Common Varieties Act. 30 U.S.C. § 611. The stipulation that at least some of the limestone was locatable despite the Common Varieties Act "conclusively establishes the material facts it contains." Todd Shipyards Corp. v. Secretary of Labor, 586 F.2d 683, 685 n. 4 (9th Cir.1978) (citation omitted). Although the administrative law judge perhaps could have exercised his discretion to reject the stipulation or require foundation evidence as a condition of accepting it, IBLA could not properly review the record and decide the facts contrary to the stipulation which had been accepted and which had shaped the hearing before the ALJ.
 
 
 20
 Furthermore, the stipulation, establishing that the relatively high purity travertine limestone at Mr. Smith's claim was locatable, was consistent with other decisions on locatability of high quality limestone on the road system and transportable to market. United States v. Foresyth, 15 IBLA 43, 59 (1974); United States v. Chas. Pfizer & Co., Inc., 76 ID 331 (IBLA 1969); cf. United States v. Alaska Limestone Corp., 66 IBLA 316, 323-24 (1982). The decision of IBLA to reject the stipulation on locatability was arbitrary and capricious.
 
 
 21
 This leaves no basis in the IBLA decision for holding Mr. Smith's mining claim null and void in response to the government's contest. The ALJ held that the limestone was not "valuable," for purposes of the Mining Law of 1872, but the IBLA did not so hold.
 
 
 22
 In his pro se brief, Smith argues that the evidence does not support the district court's affirmance of the decision below that the travertine in REC # 2 was not marketable at a profit. Because we review the district court decision de novo, the theory of that decision does not affect the outcome, and we focus on the IBLA decision.
 
 
 23
 There was evidence on both sides of the issue of value. Whether the travertine was "valuable" depends on whether it "presently could be extracted and marketed at a profit." Lara v. Secretary of Interior, 820 F.2d 1535, 1541 (9th Cir.1987) (citations and internal quotations omitted). "Minerals which no prudent man will extract because there is no demand for them at a price higher than the cost of extraction and transportation are hardly economically valuable." United States v. Coleman, 390 U.S. 599, 602 (1968). When the government tests the validity of a mining claim for lack of discovery of a valuable mineral deposit, the ultimate burden of proof is on the mining claimant, but the government bears the initial burden of going forward with sufficient evidence to establish a prima facie case that no valuable mineral discovery has been made. Lara, 820 F.2d at 1542; Foster v. Seaton, 271 F.2d 836, 838 (D.C.Cir.1959).
 
 
 24
 Smith presented evidence that his limestone was unusually easy to mine, process, and deliver to market. The government presented evidence that Seattle producers supplied all the demand in the market, that it would cost Mr. Smith more than he thought to bring his limestone to market, and that there was another Alaska source of limestone in Windy Pass. Mr. Smith presented evidence, in the form of an academic study, that Alaska-produced limestone was more attractive to customers than limestone available from Seattle, and the Windy Creek limestone deposit was of inferior quality and twice as far from market. The government's evidence consisted in large part of its expert's opinion about how high Mr. Smith's overhead would be and how low the market price would be if he were allowed to mine. Mr. Smith tried to submit additional evidence, during the pendency of his IBLA appeal, showing that he had in fact sold his limestone to several customers. One of the sales was of a substantial amount to a school district, as a soil amendment, for a price much higher than that anticipated by the government's expert. This evidence was not considered. The government expert's theory that if all demand is met by Seattle limestone, the market would be "saturated" and Mr. Smith would not be able to sell any, does not make sense. If any market is in equilibrium, a new entrant may be able to displace another participant by giving customers a price or perceived quality advantage.
 
 
 25
 The interagency correspondence in the record suggests that the Department did not base its decision exclusively upon the controlling law, the Common Varieties Act and the Mining Law of 1872, but instead balanced the desirability of permitting the mining operation against the impact it would have upon recreation in the area. The correspondence shows considerable departmental concern about the effect of the switchback road Mr. Smith used to get up and down the steep hill to the mineral site would have on the esthetics of a nearby hiking trail. Neither the Common Varieties Act nor the Mining Law of 1872 provides for denial of a mining claim on the basis of such a balancing. Regardless of what we or the Interior Department might think about the public benefit of a limestone mine in a pretty area, neither we nor the Department can repeal the Mining Law of 1872. We need not reach the question of whether the IBLA made a decision contrary to law in this respect, because we reverse its decision on another ground.
 
 
 26
 Accordingly, the district court's order affirming the IBLA is reversed, and the IBLA decision is reversed. The case is remanded to IBLA. Because Mr. Smith was proceeding pro se during the pendency of his appeal, and because the evidence he submitted after the hearing is highly relevant, the IBLA is directed to remand for an additional hearing so that Mr. Smith can submit additional evidence of marketability, or else allow his record on appeal to be supplemented with it. This panel retains jurisdiction for any subsequent review of the IBLA decision.
 
 
 27
 II. The Order of Contempt.
 
 
 28
 In his separate pro se appeal, Mr. Smith appeals the order of the district court holding him in contempt. After an order to show cause, the court determined that Mr. Smith had conducted mining operations on his claim despite the court's order to the contrary. Mr. Smith's arguments generally go to validity of his mining claim. These arguments do not furnish a basis for vacating the contempt order. A contemnor "cannot ordinarily raise the invalidity of the judicial order as a defense to a contempt charge." In re Establishment Inspection of Hern Iron Works, 881 F.2d 722, 726 (9th Cir.1989). It was incumbent upon Mr. Smith to obey the district court order not to mine, even if the administrative decision denying his mining claim was wrong.
 
 
 29
 Mr. Smith's remaining contentions are without merit. Mr. Smith has no Seventh Amendment right to jury trial because the district court determined only legal issues. Sengupta v. Morrison-Knudsen Co., Inc., 804 F.2d 1072, 1077 n. 3 (9th Cir.1986). Neither we nor the district court have jurisdiction over Mr. Smith's Fifth Amendment takings claim, which is a claim for over $10,000 lodged against the United States for an alleged constitutional violation. 28 U.S.C. § 1346(a)(2); Clouser v. Espy, 42 F.3d 1522, 1539 (9th Cir.1994). Mr. Smith's arguments that the government wrongly interfered with and trespassed on his land are meritless because the land in question is federal land, and not private land. Also, Smith failed to exhaust administrative remedies. 28 U.S.C. § 2675(a).
 
 
 30
 III. Conclusion.
 
 
 31
 The district court contempt order is AFFIRMED. The district court order affirming the IBLA is REVERSED, and the IBLA decision is REVERSED, and Smith's claim is REMANDED for further proceedings in accord with this decision.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3