**David JENKINS, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 95–70458.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1996.

Decided Feb. 25, 1997.

---

Philip A. Boyle, Baker & McKenzie, San Francisco, CA, for the petitioner.

Karen Fletcher Torstenson, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for the respondent.

Before: WALLACE, SNEED, and RYMER, Circuit Judges.

WALLACE, Circuit Judge:

David Jenkins petitions this court for review of an order of the Chief Administrative Hearing Officer, imposing a civil monetary penalty for a violation of the Immigration Reform and Control Act (Act). His petition raises important issues concerning the scope of the Act's reporting and employment eligibility verification provisions. We have jurisdiction pursuant to 8 U.S.C. § 1324a(e)(8), and we affirm.

I

On April 26, 1993, Jenkins drove to Francisco Boulevard in San Rafael, California to hire laborers for a possible one day employment. Agents Crebbs and Stutheit of the Immigration and Naturalization Service (INS) saw Jenkins pick up two men, and followed his truck back to his home. After waiting at the entrance to Jenkins's unpaved driveway for several minutes, the agents drove in and parked their vehicle in a paved, fenced-in parking area.

Crebbs and Stutheit got out of their vehicle and approached Jenkins. After a brief exchange with Jenkins, the agents attempted to question the two men. One of the workers fled and ultimately escaped apprehension, but Crebbs arrested Santos–Hernandez (Santos) and took him back to the INS district office in San Francisco for questioning. Later that day, Santos told the INS that Jenkins had hired him for a one day job, at $5.00 an hour. Stutheit recorded that testimony on an INS Form I–213. Jenkins admits that he never completed any employment eligibility verification forms for Santos.

However, Jenkins's testimony and that of the two INS agents diverged on several critical issues. First, Crebbs testified that Jenkins consented to their entry into the paved area to talk to Santos and his companion.

According to Crebbs, "[Jenkins] told me that I could talk to them, and indicated that they were in the field beside his house. We walked over to the—into the paved driveway into the rail and he called the individuals out of the field."

Jenkins remembers the exchange differently. He testified that

I walked out ... beyond the gate ... and said, "May I help you?" Agent Crebbs says, "Is this your house?" "Yes." "Is this your truck?" I answered, "Yes." And at that point he produced his ID and said—introduced himself as Agent Crebbs. He said, "I want to talk to your workers and then I'll talk to you." I said, "Am I in some kind of trouble?" He said, "Well, let me talk to your workers and then I'll talk to you."

And he was moving forward at that point. And so I turned and walked with him back to the railing and motioned for the guys to come up.

Jenkins contends that he never gave the agents consent to enter his property or to speak to the two men.

Second, Jenkins testified that he had not hired the two men and they had not yet begun work when Crebbs and Stutheit arrived at his house. According to Jenkins, he brought the two men to his house for them to assess whether they could rebuild a hillside which rain had eroded. Jenkins testified that before seeking laborers on Francisco Boulevard, he "had two engineers come out and look this job over ... and both gave me bids on this stuff that were way beyond what I could afford." He contends that Santos and his companion were similarly evaluating the job as potential employment. When the agents arrived, Jenkins testified, "[w]e hadn't commenced anything yet. I was showing them what the problem was, and was it possible for manual labor to actually do this job."

Crebbs testified that the men had already begun work when they arrived, and that the project appeared to be more akin to ordinary yard work. Crebbs testified that

[t]here was a pile of brush in the middle of a garden area that's kind of like the front yard and kind of like a little field at the front of the house. There was a pile of brush in the center of that. They were on the far side of the pile of brush, moving the brush around.

Crebbs also testified that Jenkins admitted hiring the two men. Jenkins does not deny that he made that statement, although he does not remember it.

The INS served Jenkins with a Notice of Intent to Fine for a violation of the Act. A complaint followed, which was filed in the Office of the Chief Administrative Hearing Officer (OCAHO). The complaint alleged that Jenkins violated 8 U.S.C. § 1324a(a)(1)(B) by failing to prepare an I–9 Form for Santos at the time of hire. The OCAHO initially assigned the case to an administrative law judge (ALJ) who conducted a hearing. The OCAHO reassigned the case to a second ALJ and, on the basis of the administrative record compiled to that point, the ALJ issued a final decision and order.

The ALJ found that Jenkins hired Santos for one day to rebuild an eroded hillside, and rejected Jenkins's testimony that the parties were still negotiating as implausible and unsupported by the evidence. He also found that Jenkins gave Crebbs and Stutheit consent to enter his property and to speak to Santos.

Jenkins also argued before the ALJ that the paperwork requirements of 8 U.S.C. § 1324a do not apply to the kind of casual employment at issue here. He relied on the legislative history of the Act and a regulation which provides an exception for "casual employment by individuals who provide domestic service in a private home that is sporadic, irregular or intermittent." 8 C.F.R. § 274a.1(h). The ALJ concluded that the work for which Jenkins hired Santos was not "domestic" in nature because it "was more in the form of construction work than household tasks." He held that Jenkins had violated 8 U.S.C. § 1324a(a)(1)(B) by failing to complete required INS paperwork, and assessed a civil monetary penalty of $250.00.

On appeal, Jenkins challenges the ALJ's factual findings regarding consent, the time of hire, and the nature of the work to be performed. He also argues that the ALJ's interpretation of 8 C.F.R. § 274a.1(h) is un-

reasonable and inconsistent with congressional intent.

## II

■ Jenkins argued before the ALJ that the evidence gathered by Crebbs and Stutheit should be excluded from the hearing because it was obtained in violation of the Fourth Amendment. Citing OCAHO precedent, the ALJ held that the exclusionary rule applies to administrative proceedings enforcing 8 U.S.C. § 1324a. He concluded, however, that the search did not violate the Fourth Amendment because Jenkins consented to it.

The Supreme Court has held that "whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). We will affirm the ALJ's findings of fact as long as they are supported by substantial evidence. *Mester Manufacturing v. INS,* 879 F.2d 561, 565 (9th Cir.1989) (*Mester*).

Substantial evidence in the record supports the ALJ's finding that Jenkins voluntarily consented to the entry by Crebbs and Stutheit. Crebbs testified that he asked Jenkins for permission to speak to the two workers, and that Jenkins agreed. Jenkins's testimony on that point differs, but the ALJ was within his discretion in crediting the agent's version. Although Jenkins later described Crebbs's tone as "menacing," his testimony is not inconsistent with the ALJ's findings that the agents "made no threats or show of force," and that "their guns remained holstered and under their coats."

There is, of course, an important preliminary question whether the Fourth Amendment even applies to these proceedings. This is a civil case, not a criminal case. *See, e.g., Gonzalez–Rivera v. INS,* 22 F.3d 1441, 1448 (9th Cir.1994); *OSHA v. Hern Iron Works,* 881 F.2d 722, 729 (9th Cir.1989); *Adamson v. Commissioner,* 745 F.2d 541, 545 (9th Cir.1984). Because substantial evidence supports the ALJ's finding that Jenkins gave voluntary consent, however, we

need not consider the interesting question of the appropriateness of the exclusionary rule in this civil enforcement proceeding.

## III

■ 8 C.F.R. § 274a.2(b)(1)(iii) requires employers to complete the paperwork requirements of 8 U.S.C. § 1324a "at the time of the hire" when the employment is expected to last less than three days. The regulations define "hire" as "the actual commencement of employment of an employee for wages or other remuneration." 8 C.F.R. § 274a.1(c). Jenkins challenges the ALJ's factual finding that he had already "hired" Santos when Crebbs and Stutheit arrived. Again, we review the ALJ's factual findings only for substantial evidence. *Mester,* 879 F.2d at 565.

Crebbs testified that the two men already were "clearing brush" in Jenkins's yard when he and Stutheit arrived on the scene. If Santos had already begun physical labor, there can be little doubt that his employment had "commence[d]" under 8 C.F.R. § 274a.1(c). Crebbs also testified that Jenkins admitted hiring the men. Jenkins does not deny that he made that statement. Stutheit further testified that Santos identified Jenkins as his employer during later questioning at the INS District Office. Stutheit's conversation with Santos was memorialized in a contemporaneous INS Form I–213, and both agents testified to its accuracy. Finally, the ALJ found Jenkins's testimony that the employment was still prospective or conditional to be "intuitively unrealistic" and not credible in the absence of corroborative evidence. Taken as a whole, this evidence sufficiently supports the ALJ's finding under our deferential standard of review.

Jenkins's principal argument to the contrary rests upon a fundamental misunderstanding of the fact-finder's role. Jenkins testified that he sought the help of Santos and his companion to rebuild an eroded hillside, and that he was still describing the job to them when Crebbs and Stutheit arrived. Crebbs testified that the men were already working, but that they appeared to be engaged in the simple gardening task of clearing brush. For reasons discussed later in

part IV, Jenkins would not have violated the Act if he hired Santos for simple "domestic" work. The ALJ could find a violation, therefore, only if he simultaneously accepted Jenkins's testimony as to the nature of the work and Crebbs's testimony that work already had begun. Jenkins argues that nothing in the record supports that composite view.

Put another way, Jenkins argues that the record will fairly support either a finding that work had begun, but that it was in the nature of clearing brush, or that the project was substantially more ambitious, but had not yet begun. Jenkins argues that in neither of those situations would he be liable for violating the Act.

■ But, as a finder of fact, the ALJ was not required to accept or reject the testimony of each witness *in toto*. There was nothing "inconsistent," in any legally significant sense, about the ALJ's decision to credit aspects of both Crebbs's and Jenkins's testimony.

Jenkins also challenges the ALJ's characterization of his testimony as "intuitively unrealistic." The ALJ discounted Jenkins's testimony that he was still in preliminary negotiations with Santos because "[t]he implicit premise in his claim[,] that if they decided they could not do the job he would return them to the pick up point and get more or substitute labor to complete the needed work[,] beggars the imagination." Jenkins has a point. However, the ALJ's skepticism about Jenkins's testimony was also based on the fact that the workers spoke very little English. Jenkins testified that he was able to communicate almost nothing to Santos and his companion during the ride to his home, other than the $5.00 per hour rate of pay. The language barrier does cast some doubt on Jenkins's claim that he expected the men to communicate an assessment, before beginning work, of whether the proposed effort would be successful.

In any event, our role on appellate review is not to substitute our own evaluation of the credibility of witnesses or testimony for the judgment of the ALJ. Considering the record as a whole, substantial evidence supports the ALJ's finding that Santos had already been "hired" when the agents arrived. A proper deference to the agency's role in enforcing the Act requires that our inquiry end there.

## IV

■ Finally, Jenkins contends that the work for which he hired Santos falls within an exception to the Act's paperwork and eligibility verification requirements, and that the ALJ's interpretation of 8 C.F.R. § 274a.1(h) is unreasonable and inconsistent with congressional intent. Jenkins's argument raises several difficult interpretive issues.

We begin, as we should, with the language of the statute. 8 U.S.C. § 1324a(a)(1)(B) imposes various immigration verification and reporting requirements on employers who "hire for employment in the United States." This statutory language is unambiguous: it applies to all employment in this country. That should end it, but the parties both point to a fragment of legislative history suggesting that the term "employment" contains its own limiting principle. The Report of the House Committee on the Judiciary stated that "[i]t is not the intent of this Committee that sanctions would apply in the case of casual hires (i.e., those that do not involve the existence of an employer/employee relationship)." H.R.Rep. No. 682(I), 99th Cong., 2d Sess., 1986 U.S.C.C.A.N. 5649, 5661 (House Report).

The INS promulgated a regulatory exception to 8 U.S.C. § 1324a(a)(1)(B), which is similar in part but different also from the House Report. It provides that "[t]he term 'employment' ... does not include casual employment by individuals who provide domestic service in a private home that is sporadic, irregular or intermittent." 8 C.F.R. § 274a.1(h).

Thus, the statute was inclusive of all employment in the United States. The legislative history attempted to carve out an exception for casual or short hires which do not develop into a more permanent employer-employee relationship. But the INS regulation restricted this temporal exception to "domestic service in a private home." Quite

obviously, Congress, the House Report, and the INS have set forth three different tests which have consistency (employment) and inconsistencies (temporal and type of employment exceptions).

Nevertheless, applying the regulation, the ALJ concluded that the work for which Jenkins hired Santos was "in a private home" and "sporadic, irregular or intermittent," but that it was not "domestic" in nature. The ALJ interpreted "domestic" to mean "of a nature reasonably to be expected in the upkeep and maintenance of a residence and its curtilage." Stressing that Jenkins previously had solicited cost estimates from construction companies, however, he held that "this work was more in the form of construction work than household tasks."

Jenkins argues that the ALJ's interpretation creates a broad and unwarranted "construction" exception to the casual employment exception of 8 C.F.R. § 274a.1(h). He points out that similar provisions in the Internal Revenue Code and Fair Labor Standards Act have been interpreted to include "caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use," and predicts that the ALJ's test will subject homeowners to unpredictable liability because "[m]any admittedly household tasks have a construction component." "Under the ALJ's ruling," Jenkins contends, "the neighborhood boy could mow the lawn without IRCA compliance, but if the same boy is asked to shovel some dirt the job becomes 'construction' and the INS can swoop in."

The posture of this case leaves us in an interpretive quandary. Jenkins argues that the ALJ's decision is an unreasonable interpretation of the regulation, 8 C.F.R. § 274a.1(h). But, we have serious doubts about whether the regulation itself reasonably interprets the statute or the legislative history. Therefore, we digress briefly to explain the limits of our holding.

We ordinarily defer to an agency's reasonable construction of a statute that it is charged with administering. See Chevron, U.S.A.. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); Mester, 879 F.2d at 565. But an agency interpretation is not entitled to deference if it is contrary to clearly expressed congressional intent. We have also held that "[a]s in all cases of statutory interpretation, our starting point in determining Congress's intent must be the language of the statute itself. Unless exceptional circumstances dictate otherwise, if we find the statutory language unambiguous, then we will not resort to the legislative history." Fernandez v. Brock, 840 F.2d 622, 632 (9th Cir.1988) (citation omitted). Statements in a Committee Report are not law, and it subverts our constitutional structure to treat them as such when the statutory language is facially unambiguous. See Blanchard v. Bergeron, 489 U.S. 87, 97–100, 109 S.Ct. 939, 946–48, 103 L.Ed.2d 67 (1989) (Scalia, J., concurring).

The plain language of 8 U.S.C. § 1324a(a)(1)(B) extends the employment eligibility verification system to all employers who "hire for employment in the United States." Even if we should give the concept of "ambiguity" a more generous definition than usual in Chevron cases, cf. Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 520–21, we cannot describe the term "employment" in the statute before us as ambiguous. We prefer to "presume that a legislature says in a statute what it means and means in a statute what it says there." In re Transcon Lines, 58 F.3d 1432, 1437 (9th Cir.1995), quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992), cert. denied, — U.S. —, 116 S.Ct. 1016, 134 L.Ed.2d 96 (1996).

Even if we allowed a single, conclusory assertion in the legislative history to create an ambiguity in the statute, the House Report will not support the interpretation which the agency has adopted in 8 C.F.R. § 274a.1(h). The House Report suggests, if anything, that Congress did not intend to extend the reporting requirements to employments which are extremely brief in duration. Neither the statute nor the legislative history supports the regulation's limitation of that principle to "domestic" employments.

If the issue were before us, we would address whether 8 C.F.R. § 274a.1(h) is inconsistent with the intent of Congress as expressed in 8 U.S.C. § 1324a(a)(1)(B). Jenkins, however, did not argue that issue before the agency, and we cannot reach it now. Therefore, for purposes of this case we must assume the validity of 8 C.F.R. § 274a.1(h) and decide whether the ALJ's decision in this case was a reasonable interpretation of that regulation.

"We must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 510–12, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994). The ALJ held that the work for which Jenkins hired Santos was "in a private home" and "sporadic, irregular or intermittent," but did not qualify as "domestic." He interpreted "domestic" to mean "of a nature reasonably to be expected in the upkeep and maintenance of a residence and its curtilage," and found that "this work was more in the form of construction work than household tasks."

We hold that the ALJ's interpretation of the word "domestic" was a reasonable and permissible construction of the regulation. As the ALJ emphasized in his order, Jenkins admitted that he previously had solicited bids from construction companies for this job. Jenkins testified that "I had [had] two engineers come out and look this job over, two big companies. One's Ghilotti, and I know people that do that stuff, and another was Townsend Brother's Construction, and both of them gave me bids on this stuff that were way beyond what I could afford." The ALJ held, in effect, that work for which engineers and construction companies would ordinarily be hired does not qualify as "casual domestic employment." That is not an unreasonable conclusion. If the imposition of sanctions in this case is inconsistent with congressional intent, as Jenkins argues, that inconsistency is traceable to the regulation itself, rather than to the ALJ's interpretive efforts.

Jenkins argues that we should give the "casual domestic employment" exception in the regulations the same interpretation as similar exceptions in the Fair Labor Standards Act and the Internal Revenue Code. We believe *Marshall v. Cordero,* 508 F.Supp. 324 (D.P.R.1981), a case that the INS cites, to be instructive. Interpreting similar language in the Fair Labor Standards Act, *Marshall* held that:

> It is thus apparent that by "domestic service employee" is meant those employees who perform home-related non-commercial labor in private family homes, and whose work, but for the availability of outside paid help and the economic means of the home owner to compensate the same, would be done by tradition and necessity in every household in the United States by members of that family unit. In other words, these are persons paid to do chores that are normally carried out in most homes by the family members themselves, without formal pay.

*Id.* at 325. This definition captures the essence of the ALJ's intuitive distinction between "domestic" and "construction" work. As the INS argued, it also illustrates that the ALJ's analysis is not dramatically inconsistent with the interpretation of "domestic employee" exceptions in other federal labor statutes.

## V

We hold that substantial evidence in the record supports the ALJ's factual findings regarding consent, the time of "hire," and the nature of the work to be performed. Assuming, for the purpose of this case only, that 8 C.F.R. § 274a.1(h) is consistent with the congressional intent reflected in the Act, the ALJ's interpretation of that regulation was also reasonable.

AFFIRMED.