130 F.3d 873
 42 Cont.Cas.Fed. (CCH) P 77,215, 97 Cal. Daily
Op. Serv. 9177,
97 Daily Journal D.A.R. 14,841
CITY & COUNTY OF SAN FRANCISCO, Plaintiff-Appellant,
v.
UNITED STATES of America; United States Department of
Interior; National Park Service; Bruce Babbitt, Secretary,
U.S. Department of the Interior; Roger Kennedy, Stanley
Albright; Melvin Fowler; Pacific Gas and Electric Company,
Defendants-Appellees.
 No. 96-17251.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 3, 1997.
Decided Dec. 9, 1997.
 
 Cheryl Weisbard Foung and Dennis Aftergut, Assistant City Attorneys, San Francisco, California, for plaintiff-appellant.
 Mark St. Angelo, Assistant United States Attorney, San Francisco, California, for the Federal defendants-appellees; Virginia A. Crisp, Coblentz, Cahen, McCabe & Breyer, San Francisco, California, for defendant-appellee Pacific Gas and Electric Company.
 Appeal from the United States District Court for the Northern District of California; Vaughn R. Walker, District Judge, Presiding. D.C. No. CV-95-01752-VRW.
 Before: GOODWIN, ALARCON and T.G. NELSON, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 The City and County of San Francisco (the "City"), appeals from the district court's grant of summary judgment in favor of the United States and Pacific Gas & Electric ("PG & E"). The City is a disappointed bidder for a Presidio electrical systems replacement and service contract. The City sought review from the district court, after the General Accounting Office (the "GAO") denied its protest of the National Park Service's ("NPS") award of the contract to PG & E. The City contends that PG & E should not have been awarded the Presidio electrical contract because PG & E had an organizational conflict of interest, did not submit a responsive bid proposal, and wrongly received a higher evaluation score than the City. We affirm because we conclude that the district court properly found the GAO and NPS decisions reasonable.
 
 
 2
 * The Department of Defense added the Presidio of San Francisco to the military base closure list in 1989. As required by the Golden Gate National Recreation Area Act, the Department of Defense would transfer the Presidio of San Francisco to the Department of the Interior to be administered by the NPS as Part of the Golden Gate National Recreation Area. 16 U.S.C. § 460bb-2(f). In anticipation of the 1994 transfer, NPS sought to improve the Presidio's electrical system despite uncertain plans for the future use of the Presidio. At the time of its listing, PG & E owned 20% of the Presidio's electrical system and was supplying electricity to the Presidio.
 
 
 3
 In 1990, NPS approached PG & E about conducting studies of the Presidio electrical system in anticipation of refurbishment by PG & E. At that time, NPS believed that PG & E was the only available contractor for these services and intended to award PG & E the contract on a sole-source basis, without a competitive bid process. NPS entered into two contracts with PG & E, the first for a preliminary study of the Presidio electrical system and the second for a more detailed study of the Presidio electrical system. PG & E completed the work in 1993.
 
 
 4
 In late 1993 NPS discovered that other entities were interested in the award of the Presidio electrical refurbishment contract. NPS decided to engage in a competitive procurement process. Notice of solicitation for replacement of the Presidio electrical distribution system and a ten-year electrical supply contract was published in April, 1994.
 
 
 5
 The Request for proposal ("RFP") called for replacement of the current electrical system with a 12kv system, 50% of which was to be placed underground. Bidders were required to respond to seven technical and seven cost evaluation criteria and a unit cost chart. The RFP also contained the PG & E studies, correspondence between PG & E and NPS, and the prior NPS contract requirements for PG & E including the work scope of each contract.
 
 
 6
 Four bidders submitted proposals to NPS for the Presidio contract: PG & E, the City, Women's Energy, Inc. ("WEI"), and San Franciscans for Public Power ("SSFP"). NPS established a review board consisting of ten evaluators. They determined all proposals except for SSFP's were within competitive range. The three competitive bidders were informed of the shortcomings in their proposals and asked to submit their best and final offers ("BAFO"). The BAFO's were reviewed by the board. Each criterion was independently scored.
 
 
 7
 PG & E received the highest score for both technical and cost groups and was subsequently offered the Presidio electrical contract. After being informed that PG & E offered to replace the Presidio electrical system at zero up-front cost to NPS and had received the contract award, the other bidders filed a protest with the GAO. The protesters complained that PG & E should have been excluded from the contract award due to an organizational conflict of interest. These protests were dismissed as untimely by the GAO. The City also complained that PG & E's bid was not responsive to the RFP and NPS wrongly evaluated the City's and PG & E's bid proposals. The GAO denied the protest.
 
 
 8
 The City then filed an action in federal district court against NPS and PG & E for declaratory and injunctive relief. The City claimed that NPS illegally awarded the Presidio electrical contract to PG & E because 1) PG & E had an impermissible organizational conflict of interest, 2) PG & E's bid proposal was not responsive to the RFP because PG & E submitted a fixed-price bid and had no franchise rights to deliver electricity to the Presidio, and 3) NPS's bid evaluations were arbitrary and unreasonable. The district court granted the defendants' summary judgment motion finding that, 1) the GAO's decision to dismiss the organizational conflict of interest protest as untimely was reasonable because the City should have known more than ten days prior to its protest that NPS would allow PG & E to participate, 2) the PG & E bid was responsive to the RFP as a cost-share proposal, and 3) the NPS proposal evaluations were not unreasonable nor did they prejudice the City.
 
 II
 
 9
 We review a grant of summary judgment de novo. Western Radio Servs. Co., Inc. v. Glickman, 113 F.3d 966, 969 (9th Cir.1997). "De novo review of a district court judgment concerning a decision of an administrative agency means we review the case from the same position as the district court." Sierra Club v. Babbitt, 65 F.3d 1502, 1507 (9th Cir.1995). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir.1985). In reviewing an administrative agency decision, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." Id. at 770.
 
 
 10
 Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), informal agency decisions shall only be disturbed if found "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." "This standard of review is narrow; we may not substitute our own judgment for that of the [agency]." Western Radio, 113 F.3d at 970.
 
 III
 
 11
 The City contends that the GAO wrongly dismissed its organizational conflict of interest protest of NPS's award of the Presidio electrical contract to PG & E. The GAO's bid protest regulations provide that "[p]rotests ... shall be filed not later than 10 days after the basis of protest is known or should have been known...." 4 C.F.R. § 21.2(a)(2) (1996). The City argues that the ten day limitations period began when it was notified that PG & E's bid was being "considered" for award despite the City's belief that an organizational conflict existed. The City argues that they were made aware of this fact only upon notification that PG & E received the contract award.
 
 
 12
 We must decide whether the GAO was reasonable in finding that the City "should have known" NPS would allow PG & E to compete for the Presidio electrical contract prior to NPS's award of the contract to PG & E. We are required to consider the GAO's findings. M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1298-99 (D.C.Cir.1971). Additionally, we defer to an agency's interpretation of its own regulations. Jenkins v. INS, 108 F.3d 195, 201 (9th Cir.1997). GAO decisions have recognized the importance of strict time limitations for bid protests in order to avoid delay in the government procurement process. In re Heroux, Inc., B-237432.2, 90-1 CPD P 542, 1990 WL 278074 (C.G. Jun. 8, 1990); In re Amerind Constr. Inc., B-236686.2, 89-2 CPD P 508, 1989 WL 241438 (C.G. Dec. 1, 1989).
 
 
 13
 The GAO's decision in this matter states, "the protesters should have raised the issue of an alleged organizational conflict of interest on the part of PG & E and NPS' [sic] failure to restrict PG & E's participation in the procurement when each initially became aware of PG & E's participation, not after NPS made the award." In re Women's Energy, Inc., B-258785.2-.3, 1995 WL 64164, at * 3 (C.G. Feb. 15, 1995). The City argues that the GAO's determination is inconsistent with prior GAO decisions finding that it "will not charge a protester with knowledge that another firm was considered eligible for award simply because the protester knew that the other firm had submitted an offer." In re Kimmins Thermal Corp., B-238646.3, 90-2 CPD P 198, 1990 WL 278456, at * 2 (C.G. Sep. 12, 1990).
 
 
 14
 The GAO determines whether a conflict of interest protest is timely based on the facts of each case. See, e.g., id. When a basis of protest should have been known depends on the cumulation of facts available to the protester. Thus, where the basis of protest is apparent from the solicitation or facts surrounding the solicitation, the GAO has found post-award conflict of interest protests untimely. See e.g., In re International Science and Tech. Inst., Inc., B-259648, 95-1 CPD P 16, 1995 WL 13896 (C.G. Jan. 12, 1995) (finding post-award protest untimely where solicitation named three contractors who contributed to the design of the project and included background documents specifically to "level the playing field"); In re S.T. Research Corp., B-233115.2, 89-1 CPD P 332, 1989 WL 240529 (C.G. Mar. 30, 1989) (finding conflict of interest protest untimely where protestor had received competitor's sole source statement of work and request for proposal as a potential subcontractor prior to the subsequent competitive solicitation).
 
 
 15
 In the GAO decisions on which the City relies, the protesters lacked sufficient facts to support a basis of protest prior to award. In finding the post-award conflict protest timely in In re Vast, Inc., B-182844, 75-1 CPD P 71, 1975 WL 8789 (C.G. Jan. 31, 1975), the GAO stated that "such knowledge was [insufficient] to put the protester on notice that [the bidder] had actually submitted an offer and was being considered for award." Id. at * 2. The City, on the other hand, had more information than the protester in In re Vast. The City knew that NPS originally intended to award PG & E the Presidio contract. When NPS opened the bidding process, it did nothing to exclude PG & E from the competition. Additionally, the City was informed by PG & E directly that PG & E would submit a bid proposal.
 
 
 16
 The City also relies on In re McMullen Assocs., Inc., B-188703, 77-2 CPD P 270, 1977 WL 12037 (C.G. Oct. 5, 1977), for the contention that no "GAO decision has ever required a protest to be filed at the time one believes only that an entity might be competing." City Br. 13. In In re McMullen, the GAO found that the protester had no basis to believe that an awardee would be considered eligible for award until the protester heard rumors of the agency's award decision. Again, there are additional facts on record here to show that the City should have been aware that NPS would not exclude PG & E from competition because of an organizational conflict of interest.
 
 
 17
 In the instant matter, the record shows that the City knew more than ten days prior to filing its protest that PG & E conducted studies of the Presidio electrical system for NPS in anticipation of the contract award. The City was also aware that PG & E intended to submit a bid proposal in the competitive procurement process. Representatives of the City and PG & E were present at meetings held by NPS to assist potential bidders. The City also received a letter from PG & E in response to the City's request for 1994 electrical load information in PG & E's possession which stated that PG & E was preparing a bid proposal using only the 1993 data. Relying on conflict of interest provisions included in the RFP, the City argues that it believed NPS would disqualify PG & E after the initial proposals were submitted. The question, however, is not what the City believed, but what the City should have known given the cumulation of facts available to the City at that time. In relying on its belief that NPS would exclude the proposal, the City acted at its peril.
 
 
 18
 In this case, the City knew of facts that would support a protest on conflict-of-interest grounds against awarding the contract to PG & E at an early stage in the bidding process. The RFP included work done by PG & E in anticipation of a sole source contract. PG & E representatives attended both of the preparatory meetings. The City and NPS were made aware by PG & E that it was relying on 1993 load data to prepare its proposal. Based on this record, the GAO finding that the City should have filed its organizational conflict-of-interest protest sooner was not unreasonable. Therefore, we decline to consider the merits of the City's claim that PG & E had organizational conflict-of-interest.
 
 IV
 
 19
 The City asserts that PG & E's bid proposal was "nonresponsive" and as such should have been disqualified from the procurement process. "Responsive" is a technical term as used in the Federal Acquisition Regulations ("FAR") § 14.301.[1] It does not strictly apply to negotiated procurements such as this one. See In re Pacificon Prods., Inc., B-196371, 80-2 CPD P 58, 1980 WL 16248, at * 3 (C.G. Jul. 22, 1980) (finding it "inappropriate to discuss the compliance of a proposal with the terms of an RFP in terms of responsiveness" because the concept is "not directly applicable to negotiated procurements"). The GAO has found, however, that use of this term in negotiated procurements may "indicate that certain terms and conditions are material and that a proposal which fails to conform to them may be considered unacceptable." In re Vinnell Corp., B-20386, 82-2 CPD P 101, 1982 WL 27165, at * 3 (C.G. Aug. 3, 1982). NPS used the term "nonresponsive" in the RFP with respect to certain provisions. Under the above stated rule, these provisions should be considered material. Thus, we must determine whether NPS was reasonable in finding that PG & E's bid complied with the RFP's material provisions.
 
 
 20
 The City first argues that PG & E's bid did not comply with the RFP because PG & E failed to include unit costs. Inclusion of unit costs was a material provision in the RFP because NPS warned that failure to include these items would result in a finding of "nonresponsiveness." See id. PG & E did include unit costs in an amendment to its proposal, but did not base its bid directly on these costs. PG & E instead proposed zero cost to NPS. Thus, it was reasonable for NPS to find PG & E's proposal met this RFP requirement because PG & E included both the unit costs to itself and NPS for building the system.
 
 
 21
 Second, the City contends that PG & E failed to submit a cost-reimbursement contract proposal as required by the RFP, but instead submitted a fixed-price contract proposal. Specifically, the City argues that the proposal was for a firm-fixed-price contract because NPS liabilities were capped at a certain amount. PG & E's proposal required NPS to pay PG & E $2 million if the Letterman Hospital (within the Presidio grounds) was not under a ten-year lease when the new electrical system was energized. The City argues that this contingency plus the $2 million NPS set aside for twenty-one contingencies included in PG & E's BAFO makes the contract proposal "fixed" in price. The City also asserts that even if the PG & E proposal was for a cost-share contract, the RFP did not implicitly allow for this type of contract.
 
 
 22
 The district court concluded that what PG & E proposed was a cost-share contract. It held that a cost-share contract is acceptable as a subcategory of cost-reimbursement contracts under the FAR.
 
 
 23
 We first decide whether it was reasonable to find a cost-share contract proposal compliant with the RFP cost-reimbursement requirement. Then we consider whether it was reasonable to find PG & E's contract proposal consistent with the definition of a cost-share contract. The FAR provides that "contract types are grouped into two broad categories: fixed-price contracts (see subpart 16.2) and cost-reimbursement contracts (see subpart 16.3)." 48 C.F.R. § 16.101(b) (1996). Within these broad categories there are five specific fixed-price type contracts and six specific cost-reimbursement type contracts. The NPS RFP called for a "cost-reimbursement no fee (profit)" contract.
 
 
 24
 Subpart 16.3 defines cost-reimbursement contracts. There are two types of cost-reimbursement contracts where the contractor will not receive a fee; cost contracts, § 16.302, and cost-sharing contracts, § 16.303. The RFP did not specify one or the other. Thus, it was reasonable for NPS to accept a cost-share contract proposal as in compliance with the RFP requirement.
 
 
 25
 We are also persuaded that PG & E's contract proposal was consistent with the FAR definition of a cost-share type contract (§ 16.303), not a firm-fixed-price contract (§ 16.202). The FAR defines these types of contracts as follows:
 
 
 26
 A cost-sharing contract is a cost-reimbursement contract in which the contractor receives no fee and is reimbursed for an agreed-upon portion of its allowable costs. [It] may be used when the contractor agrees to absorb a portion of the costs, in the expectation of substantial compensating benefits.
 
 
 27
 48 C.F.R. § 16.303(a)-(b)(1996).
 
 
 28
 A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss.
 
 
 29
 48 C.F.R. § 16.202-1(1996). PG & E initially proposed that NPS reimburse none of its costs for replacing the Presidio electrical system. PG & E anticipated recovery of its investment by supplying electricity to the Presidio under the ten-year electrical supply contract included in the RFP. This is consistent with the expectation of compensating benefits as stated in the cost-sharing contract definition.
 
 
 30
 The Letterman Hospital lease and conditions later imposed were PG & E's way of allocating to NPS some of the cost for these contingencies, not fixing the price of the contract. The City's argument, that these payments convert this into a fixed-price contract, ignores a 1996 GAO decision holding that a cap on cost reimbursement does not convert one type of contract into another. In re Hughes Space and Communications Co., B-266225.6, 1996 WL 194329 (C.G. Apr. 15, 1996). In In re Hughes Space, the GAO found the awardee's proposal to share cost overrun by 50% "like a cap."
 
 
 31
 While we will sustain a protest where the record shows that the agency does not understand the operation of a proposed cap, or has failed to adequately assure that the proposed cap will effectively shield the government from cost growth, we generally view cost caps and ceilings as powerful and effective tools in the government's arsenal against cost overruns. In none of these cases, however, did our Office conclude that the challenged cap changed the solicited contract type....
 
 
 32
 Id. at * 7 (citations omitted).
 
 
 33
 An agency's interpretation of a "regulation it is charged with administering is entitled to a high degree of deference." Rainsong Co. v. Federal Energy Regulatory Comm'n, 106 F.3d 269, 272 (9th Cir.1997). The set amount proposed by PG & E is "like a cap" on costs reimbursed by NPS and as such it is consistent with the FAR cost-share contract definition. Therefore, NPS was not unreasonable in accepting PG & E's contract proposal.
 
 
 34
 Third, the City argues that NPS violated FAR § 15.606 by failing to notify the other bidders that a different type of proposal would be acceptable under the RFP. The NPS evaluated the initial proposal without notifying other bidders that a fixed-cost or cost-share proposal would also be acceptable.
 
 
 35
 FAR § 15.606 requires a procuring agency to inform all potential bidders of any change in solicitation requirements by amendment or complete revision of the RFP. 48 C.F.R. § 15.606 (1996). NPS reasonably determined that PG & E proposed a cost-share contract, not a fixed-price contract. NPS also reasonably determined that the cost-share contract type fell within the definition of the "cost-reimbursement no fee" requirement called for in the RFP. Accordingly, there was no need for NPS to notify other bidders of a change in RFP requirements.
 
 V
 
 36
 The City contends that NPS failed to evaluate properly the bid proposals submitted by the City and PG & E. The City first argues that NPS failed to conduct a cost-realism analysis required by the RFP and FAR for cost-reimbursement contracts. In a cost-realism analysis an agency independently evaluates the bidders stated costs to assure they are not artificially low, but realistic. In re Versar, Inc., B-254464.3, 1994 WL 120013, at * 2 (C.G. Feb. 16, 1994). This practice permits an agency to determine its exposure to cost overrun. In re Advanced Tech. Sys., Inc., 64 Comp. Gen. 344, B-215124, 85-1 CPD P 315, 1985 WL 50658, at * 3 (C.G. Mar. 18, 1985). Defective cost analysis that may lead to cost overrun is a potential problem in cost-reimbursement type contracts where the agency is liable for actual costs rather than a fixed-price. Id.
 
 
 37
 The GAO has found, however, that where a bidder has proposed a cap on agency reimbursement costs, a cost-realism analysis may not be necessary because the cap shifts the risk from the agency to the contractor. Id. The agency need only review the cap to determine whether it will adequately protect the agency from the risk of cost overrun. See In re Barents Group, L.L.C., B-276082.2, 97-1 CPD P 164, 1997 WL 282110, at * 8 (C.G. May 9, 1997) (finding that where a bidder proposes a cap on costs to the agency it is sufficient for the agency to "determine the offerors' understanding of the requirements and measure the risk that an offeror will not be able to perform"); In re Robocom Sys., Inc., B-244974, 91-2 CPD P 513, 1991 WL 270347 (C.G. Dec. 4, 1991) (finding that a cap on reimbursable costs shifts the risk from the government agency to the bidder requiring a determination of bidder responsibility). The question for the agency then becomes one of contractor responsibility--whether an awardee will be able to perform under the terms of the proposed contract despite any miscalculations. Halifax Technical Servs., Inc. v. United States, 848 F.Supp. 240, 242 (D.D.C.1994).
 
 
 38
 In arguing that PG & E's costs are unrealistic, the City asserts that NPS failed to consider that PG & E proposed much higher costs in anticipation of the sole source contract. The City also asserts that NPS failed to determine whether PG & E could recoup the costs as stated in its proposal. These assertions question PG & E's ability to perform under the proposed contract terms and thus are more appropriately characterized as concerns about contractor responsibility. An agency's determination of a contractor's responsibility is "only reviewable upon a showing of agency fraud, bad faith or misapplication of responsibility criteria."[2] Id. Responsibility criteria were included in the RFP. The City's allegations do not challenge NPS's application of these criteria and thus do not come within this standard.
 
 
 39
 The City further maintains that NPS improperly scored the City proposal lower than the PG & E proposal on eight of the RFP criteria. "In reviewing a protest challenging an agency's evaluation of proposals ... [the GAO] will examine the record to ensure that the agency's evaluation was reasonable and consistent with stated evaluation factors." In re Richard M. Milburn High School, B-277018, 1997 WL 473057, at * 3 (C.G. Aug. 19, 1997). Deference to the agency's determinations is warranted with respect to these allegations in particular due to their detail and technical nature. See Elcon Enters. v. Washington Metro. Area Transit Auth., 977 F.2d 1472, 1478-79 (D.C.Cir.1992).
 
 
 40
 Additionally, the City must show that any unreasonable or arbitrary scoring by NPS resulted in competitive prejudice against the City. See CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed.Cir.1988) (finding, in accordance with GAO decisions, that "prejudice is a separate element which must be proven"); In re IGIT, Inc., B-275299.2, 1997 WL 369348, at * 6 (C.G. Jun. 23, 1997) ("[O]ur Office will not sustain a protest unless the protester demonstrates a reasonable possibility that it was prejudiced by the agency's actions, that is, unless the protester demonstrates that, but for the agency's actions, it would have had a substantial chance of receiving the award.").
 
 
 41
 1) Solvency and longevity. The City contends that the NPS's award of 176 points as opposed to the 196 points awarded PG & E was arbitrary and unreasonable because by law the City cannot "operate at a deficit or become insolvent." This information was not included in the City's proposal. Therefore, NPS's failure to rely on such information cannot be unreasonable. Accordingly, the City has failed to demonstrate that its score in the category of solvency and longevity was arbitrary or unreasonable.
 
 
 42
 2) Retail experience. The City contends that NPS erred in awarding the City a lower score in this category than PG & E because it had fewer and more limited retail accounts; a factor which NPS should not have considered. This RFP criterion required bidders to demonstrate the adequacy of their experience. The RFP also stated that, "[i]t is desirable for the offeror to show enough experience in this area to exhibit an acceptable retailer/customer relationship." (emphasis added). The RFP did not exclude the number and scope of retail accounts as evidence of this criterion. Therefore, it was not arbitrary or unreasonable for NPS to consider this evidence of experience in its evaluations.
 
 
 43
 3) Innovative energy concepts. The City argues that it deserved a higher score in this category than PG & E because it received "national recognition" in environmental achievements. PG & E's proposal also included reference to national recognition for PG & E in environmental achievements. The Evaluation comments show that NPS considered both the City's and PG & E's award status. Furthermore, the City and PG & E similarly addressed the topic of innovative energy concepts in their proposals. The City has failed to show that NPS's evaluation of this category was arbitrary or unreasonable.
 
 
 44
 4) Regulatory climate. The City argues that it deserved a higher score in the category requiring knowledge of and compliance with the regulatory climate because, unlike PG & E, it is exempt from the franchise and certificate of public convenience requirements in the RFP. The RFP required that bidders obtain a certificate of public convenience and necessity issued by the California Public Utility Commission (the "CPUC"). See Cal. Pub. Util.Code § 1001. In its proposal the City included a letter from the CPUC that it is exempt from this requirement under California law. See Los Angeles Gas & Elec. Corp. v. Department of Pub. Serv. of City of Los Angeles, 52 Cal.App. 27, 197 P. 962 (1921).
 
 
 45
 The RFP also required bidders to obtain a franchise license from the Public Utility Commission of the City and County of San Francisco prior to the contract award. The City also claimed exemption from this requirement under California law. In fact the City issues franchise licenses for distribution of electricity within the boundaries of the City and County of San Francisco. See Cal. Pub. Util.Code § 6202.
 
 
 46
 PG & E is subject to both these requirements. In its BAFO, PG & E included a copy of its certificate of convenience and necessity from the CPUC and a copy of its franchise license issued by the City. It was reasonable for NPS to find that both the City and PG & E met these requirements for scoring purposes. The City has not shown otherwise.
 
 
 47
 5) Cost of ownership. The RFP required the bidders to "show and justify what costs to the government are associated with the [bidder] owning the new 12kv electrical distribution system." The City contends that NPS's evaluation of this factor was unreasonable because it used zero as PG & E's proposed costs rather than the $2 million contingency NPS would have to pay PG & E if the Letterman Hospital lease was not in place.
 
 
 48
 In its initial proposal and BAFO, PG & E listed the cost of ownership to NPS as zero. PG & E included the cost of $2 million for the Letterman hospital contingency under its estimated cost of installation in its BAFO. The evaluation comments show that NPS included this contingency cost in its evaluation of PG & E's cost of installation, not its cost of ownership. Additionally, NPS included this cost in its life cycle cost evaluation.
 
 
 49
 The City proposed a cost of $1,745,000 as the cost of ownership to NPS. Both the City and PG & E stated in their BAFO's that they would not sell to a third party during the ten-year service contract. At the end of this period, both the City and PG & E would give NPS the option to purchase the system for a fair value. The City has failed to show that NPS acted arbitrarily or unreasonably by including the $2 million Letterman contingency under PG & E's proposed installation costs, instead of its cost of ownership.
 
 
 50
 6) Aid of contribution tax. The City contends that the NPS evaluation was arbitrary because it failed to award the City more points for its exemption from tax liability. NPS evaluated PG & E similarly. NPS found that PG & E would owe no tax because it would not require any reimbursement for costs. The City does not argue any differently. These scores do not appear arbitrary.
 
 
 51
 7) Rate schedules. The City contends that it deserved a higher score in this category because its rates were currently lower and both the City's and PG & E's rates were subject to change. Despite the fact that the City's rates were lower, the City anticipated "market rates" eventually. Additionally, the City anticipated raising rates if revenue from Presidio leases decreased below costs. The evaluation comments noted that PG & E would use standard rates without "adjustments for revenue variance." These scores do not appear arbitrary.
 
 
 52
 8) Life cycle costs. The City argues that NPS's evaluation of life cycle costs was unreasonable because NPS failed to account for high and low usages in analyzing the City's proposal, but did so for PG & E. The record shows that NPS has failed to explain why the distinction was made in PG & E's case, but not the City's. The City has failed to show, however, that a distinction between high and low usages in analyzing the City's life cycle costs would have resulted in a significant difference in cost, and thus scoring. Additionally, the difference in evaluation points in this category is not enough to change the result of PG & E's higher overall score.
 
 
 53
 Finally, the City complains that NPS wrongly selected PG & E's proposal based on cost. This argument rests on the allegations of unreasonableness in NPS's evaluation since PG & E's proposal actually received a higher technical score than the City's proposal. Whether or not the City's technical scores should now be raised due to NPS evaluation errors, does not change the fact that NPS relied on PG & E's higher technical scores at the time it chose PG & E's proposal over the City's. Under these circumstance, it is impossible to argue that NPS relied solely on cost during the selection process. Therefore, this argument has no merit and the City has failed to show NPS abused its discretion.
 
 VI
 
 54
 The City maintains that the district court erred in refusing to consider the City's claim that PG & E is not entitled to the Presidio contract award because PG & E has no franchise rights to deliver electricity to the Presidio. To satisfy the RFP franchise license requirement, PG & E included a copy of an ordinance adopted by the City in 1939 ("1939 Ordinance"). The 1939 Ordinance grants a franchise license to PG & E to operate within the City and County of San Francisco. The City argues that this ordinance does not include the area within the Presidio.
 
 
 55
 The City first raised this claim in its complaint to the district court. PG & E concurrently filed a claim against the City in the San Francisco Superior Court concerning this same issue. The district court considered PG & E's motion to bifurcate the franchise issue and stay the case pending a decision in state court. The district court declined to decide the franchise issue. The court found the issue beyond the scope of the administrative record because the City failed to raise it with the NPS or the GAO.
 
 
 56
 On appeal to this court, the City argues that because it was not required to exhaust administrative remedies the City should not be restricted from bringing additional claims with the district court. The defendants argue that pursuant to the APA § 706(2)(D), a court's review is limited to issues raised in the administrative proceedings.
 
 
 57
 We need not decide this issue because it is now moot. On August 5, 1997, PG & E and the City stipulated to a judgment granting PG & E the right to supply electricity to the Presidio provided PG & E pays the City appropriate franchise fees. Article III of the U.S. Constitution prohibits federal courts from deciding issues which are moot. See Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969).
 
 
 58
 AFFIRMED.
 
 
 
 [1]
 FAR § 14.301 states in pertinent part:
 Responsiveness of bids.
 (a) To be considered for award, a bid must comply in all material respects with the invitation for bids. Such compliance enables bidders to stand on an equal footing and maintain the integrity of the sealed bidding system.
 
 
 [48]
 C.F.R. § 14301 (1996) (additional subparts omitted)
 In the FAR a negotiated procurement is distinguished from a sealed bid procurement. Responsiveness applies directly to sealed bids under FAR part 14, but there is no counterpart applicable to negotiated procurements discussed in Part 15.
 
 
 [2]
 Responsibility criteria are defined in FAR § 9.104. They include 1) adequate financial resources, 2) ability to comply with performance schedule, 3) satisfactory performance record, 4) necessary organizational and administrative skills, and 5) necessary access to production, construction, and technical facilities. 48 C.F.R. § 9.104-1 (1996)